[S. F. No. 16840. In Bank. Aug. 18, 1944.]

MATSON TERMINALS, INC. (a Corporation) et al., Petitioners, v. CALIFORNIA EMPLOYMENT COMMISSION et al., Respondents; FRANK ABELLEIRA et al., Interveners and Respondents.

Brobeck, Phleger & Harrison, Gregory A. Harrison, M. B. Plant and Richard Ernst for Petitioners.

Earl Warren, Attorney General, Robert W. Kenny, Attorney General, John J. Dailey, Deputy Attorney General, Maurice P. McCaffrey, Ralph R. Planteen, Charles P. Scully, Forrest M. Hill, Leonard M. Friedman, Gladstein, Grossman, Margolis & Sawyer, Ben Margolis, William Murrish, Glad-

stein, Grossman, Sawyer & Edises, Aubrey Grossman and Richard Gladstein for Respondents.

TRAYNOR, J.—The petitioners, a number of steamship and stevedoring companies that are employers within the meaning of the California Unemployment Insurance Act (Stats. 1935, ch. 352, as amended; Deering's Gen. Laws, Act 8780d), seek a writ of mandamus to prevent enforcement of an order of the California Employment Commission awarding unemployment insurance benefits to a group of longshoremen, interveners herein.

The petitioners operate pier and terminal facilities in the San Francisco Bay area and are associated together in an incorporated, nonprofit association, the Waterfront Employers' Association of San Francisco, which acts as intermediary between them and their employees, represents them in collective bargaining and in the operation and maintenance of a hiring hall, compiles statistical information, and serves as a central clearing office of records of hours and wages of the longshoremen. It is also the agent of the employers in computing the contributions and making the reports required by the Unemployment Insurance Act. The association does not handle cargoes or operate ships or terminal facilities, or otherwise engage in the business of shipping or stevedoring. The companies constituting its membership are separate businesses, each with its own organization and personnel. The association does not include certain private companies operating pier and terminal facilities, the United States Army Transport Service, which owns and operates its own pier facilities on a military reservation, or the Port of Oakland, which owns and operates docks at Oakland. The longshoremen who are claimants in the present proceeding work intermittently at various places for various employers.

The method of hiring longshoremen prescribed by the collective bargaining agreement between the association and Local 1-10 of the International Longshoremen's and Warehousemen's Union, District No. 1, was adopted after their strike in 1934, with the object of improving the distribution of employment. It seeks to make work opportunities available to all longshoremen equally by dispatching them in rotation to jobs. Instead of reporting to the docks operated by each company, they report to a hiring hall jointly maintained and operated by the employers' association and the long-

shoremen's union through a Labor Relations Committee composed of three employer and three union representatives. Employers place their requests with the dispatcher at the hiring hall, who is selected by the union but is an employee of the Joint Labor Relations Committee. In dispatching men for work, preference is given to registered longshoremen, and no one else may be employed while anyone on the list of registered longshoremen is qualified, ready, and willing to work. The Labor Relations Committee alone has the power to add names to the list or remove them. It may also issue permits allowing their holders to work if no registered longshoremen are available, and some of the claimants herein are such ''permit men.'' When men dispatched from the hiring hall report at a particular dock and are there dismissed without work, the company operating the dock must pay them two hours' ''stand-by'' compensation. At present the employers' association maintains a central office to which each employer forwards his payments and where the worker receives all the checks due him, but this proceeding relates to a time when the men received their checks by calling at the offices of the various companies for which they had worked during the week.

The employers who are petitioners herein employ dock checkers, who keep records of the cargo loaded or discharged for the employers, and who belong to the Ship Clerks' Union, a local union affiliated with the same international as the longshoremen's union. For the purpose of bargaining collectively with the Ship Clerks' Union, the employers belonged to the Dock Checkers Employers' Association of San Francisco. As a result of a dispute between the two, the Ship Clerks' Union called a strike on November 10, 1939, effective at 6:00 p. m., against employers who were members of the Dock Checkers Employers' Association. The strike continued until January 3, 1940. Members of the longshoremen's union did not work for these employers during this period but filed claims with the California Employment Commission for unemployment insurance benefits relating to this period.

When the strike began, some claimants were working upon unfinished jobs for employers against whom the strike was declared; others were at the hiring hall awaiting their next assignment; others who were working for employers not involved in the dispute did not stop work until their job assignments were completed.

The adjustment unit of the commission allowed benefits

to all the claimants, and the referee who heard the matter upon the employers' appeal affirmed this determination. The employers then sought a writ of mandamus from the District Court of Appeal, Third Appellate District, to prevent the commission from paying benefits to claimants. The District Court of Appeal issued an alternative writ and ordered the commission not to pay the benefits pending determination of the matter on the merits. This court, however, issued a peremptory writ of prohibition restraining the District Court of Appeal from enforcing the writ of mandate or the restraining order against the commission. (*Abelleira* v. *District Court of Appeal,* 17 Cal.2d 280 [109 P.2d 942, 132 A.L.R. 715].) Meanwhile, the commission ordered the referee's decision set aside and set the matter, then pending before it on appeal, for hearing. Furthermore, pending a determination on the merits, it refused to allow payment of the accrued benefits to claimants. Claimants' petition to this court for a writ of mandamus to compel payment of these benefits was denied. (*Abelleira* v. *California Employment Commission,* S. F. No. 16585.) Subsequently the commission, with two members absent and one dissenting, allowed benefits to all claimants except those who were working on cargoes when the strike was declared and were under instructions to return for work on those cargoes on the following day, and who refused to cross the ship clerks' picket lines. Even in these cases benefits were allowed if the employer's agent did not instruct the men to work or the foreman told them they might as well return to the hiring hall. By stipulation the case was submitted on the record of the proceedings before the commission with the reservation of the right to try the question before the court whether the parties should have the right to try the case de novo, but the question as to this right was not argued.

The commission and the claimants contend that the employers have not exhausted their administrative remedies and are therefore not entitled to the writ. They assert that section 41.1 of the Unemployment Insurance Act (Stats. 1941, p. 2535; Deering's Gen. Laws, 1941 Supp., Act 8780d, § 41.1), added in 1941 after the decision of this court in *Bodinson Mfg. Co.* v. *California Employment Com.,* 17 Cal.2d 321 [109 P.2d 935], supplies the remedy that the court there found lacking and provides the employer with a new administrative and legal remedy that adequately protects his rights. Section

41.1 requires the commission to furnish the employer with annual itemized statements showing the charges and credits to his account, the net balance of his reserve, and his contribution rate for the next succeeding rating period. It provides that he may within a certain period protest any item shown therein, and, if the proceeding is determined against him, bring an action against the commission to recover the amount of contribution claimed as an overpayment after such determination, although no protest was filed at the time of payment. Section 41.1, however, does not provide a remedy for the illegal payment of benefits nor does the relief it affords differ substantially from that provided by section 45.10 of the act. The latter section provides for the payment of contributions under protest and allows the employer to bring an action against the commission to recover contributions so paid. Section 41.1 simply makes it unnecessary to file a protest as a condition to contesting items charged to the employer's account and suing for the recovery of allegedly excessive contributions, and provides for supplying him information upon which to base his contest. It, therefore, can no more operate to deprive the court of power to review a decision of the commission awarding unemployment benefits alleged to be in violation of the plain provisions of the act than can the provision for court review in section 45.10. (See *Bodinson Mfg. Co.* v. *California Employment Com., supra.*)

The commission and claimants contend, however, that the employer's only interest is in his merit rating, and that section 41.1 affords an adequate remedy to contest charges to his account affecting that rating. Although section 41.1 provides for an administrative determination of the correctness of the charges and for recovery of overpayments, this remedy, like that afforded by section 45.10, is distinct from that provided by section 67 of the act to test the propriety of the payment of benefits. Section 67 provides for the determination of the claimant's application for benefits and ''any employer whose reserve account may be affected by the payment of benefits to any individual formerly in his employ may become an interested party to any proceeding under this article. . . .'' As a party to the proceeding he may appeal from the initial determination (Deering's Gen. Laws, 1939 Supp., Act 8780d, § 67) or from the decision of the referee

(Deering's Gen. Laws, 1939 Supp., Act 8780d, § 72). The act thus recognizes his adversary interest in preventing the illegal payment of benefits and does not limit his remedy to a protest of charges that have been made to his account after the disputed benefits have been paid. He is a party "beneficially interested" in the administrative proceeding to determine the award of benefits and retains this status for the purpose of testing before a court of law the legality of the commission's final decision. (*Bodinson Mfg. Co.* v. *California Employment Com., supra*, at pp. 330-331.)

■ There is nothing in the statute to indicate that section 41.1 was intended to afford the employer an opportunity to relitigate the propriety of the award of benefits. Since he may raise objections to the award in proceedings under sections 67 and 72, the decision in such proceedings will finally determine the propriety of the payments, thus precluding objections by him to charges based upon the claimants' ineligibility for benefits in later proceedings to which they are not parties. The commission so interpreted its rule 41.1, which was in effect before the adoption of section 41.1 and which was phrased in substantially the same terms. (See Commission's Interpretative Bulletin, Commission form DE 1759.)

■ Petitioners contend that the claimants are not entitled to benefits on the ground that under section 56(a) of the act a claimant is ineligible to receive them if he left his work because of a trade dispute, for the period during which he "continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed." They contend that claimants' work was the longshore work at the San Francisco waterfront docks and that under the rule of *Bodinson Mfg. Co.* v. *California Employment Com.*, 17 Cal.2d 321 [109 P.2d 935], they left their work because of a trade dispute when they refused to perform it during the employers' dispute with the Ship Clerks' Union.

In the Bodinson case the claimants were employed by the Bodinson Manufacturing Company as machinists. On May 24, 1939, a strike was called by employees of the company who were members of the Welders' Union, Local No. 130. The claimants refused to pass through the picket line established by the welders at the employer's plant and contended that they were entitled to benefit payments on the ground that they had not left their work voluntarily but were prevented

by the picket lines from going to work. The court rejected this contention: "If the picket line was maintained within the limits permitted by law, as this one presumably was, no physical compulsion was exerted to prevent co-respondents from working. They were unemployed solely because, in accordance with their union principles, they did not choose to work in a plant where certain of their fellow employees were on strike. Their own consciences and faith in their union principles dictated their action. This choice is one which members of organized labor are frequently called upon to make, and in the eyes of the law this kind of choice has never been deemed involuntary. . . . In brief, disqualification under the act depends upon the fact of voluntary action, and not the motives which led to it. The Legislature did not seek to interfere with union principles or practices. The act merely sets up certain conditions as a prerequisite to the right to receive compensation, and declares that in certain situations the worker shall be ineligible to receive compensation. Fairly interpreted, it was intended to disqualify those workers who voluntarily leave their work because of a trade dispute. Co-respondents in this proceeding in fact 'left their work because of a trade dispute' and are consequently ineligible to receive benefit payments."

The claimants in the present case refused to work for the same reason that the claimants in the Bodinson case refused to work. They could have continued working at the same docks, for the same employers, under the same dispatching arrangement through the hiring hall as they had before the ship clerks' strike, and would have done so but for that strike and their unwillingness to cross the ship clerks' picket lines. They worked as they had in the past until the clerks' strike began and from then until the end of the strike refused to do any work affected by the strike. When the strike was over they returned to their work in the only way they could, by reporting to the hiring hall, each accepting his share of the work as it was assigned. The failure of the claimants, including those who were engaged on a work assignment at the time the clerks' strike began, or who were working at that time at docks unaffected by the strike, to work during the period for which benefits are claimed was attributable solely to the trade dispute between their employers and the Ship Clerks' Union. Each of the many longshoremen who testified asserted that he would not work during the clerks' strike behind the

picket lines, and at the beginning of the strike responsible union officials announced on behalf of the longshoremen their refusal to work. It is immaterial, therefore, that some of the longshoremen were not instructed to work or were told to return to the hiring hall. Their work was available to them during the dispute as it was in the past, but pursuant to their union principles they voluntarily refused it. They therefore left their work within the meaning of the act because of a trade dispute. This case accordingly falls within the rule of the Bodinson case.

The commission and claimants contend that the Bodinson case is not controlling on the ground that when the welders in that case went on strike and the claimants refused to work, the relationship of employer and employee existed between the claimants and the Bodinson Manufacturing Company, whereas in the present case, except for those longshoremen engaged upon a work assignment at the time the clerks' strike was called, there was no relationship of employer and employee between the claimants and any particular employer. The commission's holding that such a relationship must exist and that it did not exist in this case is based upon its interpretation of the provisions of section 56(a) determining the duration of the disqualification. The section provides that a claimant is ineligible for benefits while "he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed" and thus contemplates that the "work" that claimant left was in an "establishment in which he was employed." The commission contends that the word "employed" envisages the "legal relationship of employer and employee" between the claimant and a particular employer at the precise moment that the trade dispute arises, and that a longshoreman in the interim between work assignments is not "employed" for the reason that he is under no contract of hire, but simply has a right to be dispatched to a new assignment in his proper rotational order and, therefore, does not stand in the legal relationship of employer and employee with any particular employer. Under the commission's interpretation of section 56(a) the waterfront docks do not constitute an "establishment" since they were separately owned and controlled by the various companies and were operated as separate enterprises.

Had the Legislature intended, however, that disqualifica-

tion under section 56(a) should turn on whether the claimant had ended a legal relationship of employer and employee at the precise moment the trade dispute arose, it would hardly have failed to speak in terms of that relationship or to provide some standard by which its existence at that time could be determined. It is unlikely that the Legislature would leave it to the commission, a body of laymen, to deduce such an intention from the words "left his work" by way of a presumed definition of the word "employed." Since there is no generally accepted test for determining at a particular moment whether a person is "employed" it cannot be presumed that the Legislature intended such a test when it used that word in section 56(a). The test for such a determination may vary according to the nature of the rights and liabilities involved. Thus a person might be regarded as employed at a given time when the question concerned the privileges and liabilities arising from concerted action by employees (See Restatement: Torts: § 775, et seq.) but would not be regarded as employed if the question concerned the liability of the employer to third persons (See Restatement: Agency: §§ 220, et seq.) or the liability of the employer to the employee. (See the Workmen's Compensation Act, Lab. Code, §§ 3201-6002.) The Labor Code provides that a worker's employment is terminated by expiration of its appointed term (§ 2920), and that he "is presumed to have been hired for such length of time as the parties adopted for the estimation of wages" so that a "hiring at a yearly rate is presumed to be for one year; a hiring at a daily rate, for one day." (§ 3001; see *White* v. *City of Alameda,* 124 Cal. 95 [56 P. 795].) If the existence of the "legal relation of employer and employee" were determined by these sections, workers who are employed on an hourly or daily basis would be disqualified by a strike only if they dropped their tools in the midst of work and walked off the job. Under such a test the claimants in the Bodinson case would have been entitled to benefit payments.

The claimants agree that the foregoing provisions of the Labor Code are not controlling and that a man may leave his work within the meaning of the act "when he is not actually engaged in work at the time that the trade dispute starts." They contend, however, that registered longshoremen are not steadily employed, for they do not know from one day to the next whether they will be employed, or if so,

by whom, whereas workers like those in the Bodinson case, who are "regularly employed," or longshoremen on a work assignment that is not finished, are on someone's payroll and go home at night or for the week-end knowing when they are to return to work, for what employer, and at what job. The attempted distinction thus turns on the "probable expectancies" (See *Jersey City Printing Co.* v. *Cassidy*, 63 N.J.Eq. 759 [53 A. 230, 233]) in the two types of employment. Workers like those in the Bodinson case can reasonably expect at the end of each day that their work will be available to them the following day, just as the employer can reasonably expect them to be present to perform that work. The expectancy is based only on a probability, however, for each party may terminate the relationship at will, whether because the employer has no work to be performed, the employee is unable to perform it, or either is unwilling to continue the relationship. A registered longshoreman, however, has more than an expectancy; his right to work is more secure than that of the ordinary employee, for he has a legally enforceable right whereby the group is entitled to first call on the work and each longshoreman is entitled to his share. Although he does not work regularly for the same employer at the same place of business, a procedure forbidden by the contract between the longshoremen's union and the employers' association, and the intervals between work assignments may at times be longer than those for a factory worker, because of the intermittent nature of longshore work, he works under an employment arrangement that assures him his proportionate share of the work on the San Francisco waterfront. He is not permitted to look for work with the individual members of the employers' association but is dispatched to the various docks where his services are required, in his turn in the manner described. Under the arrangement provided by the contract the longshore work of the port is his work. If there is work to be done the employers cannot refuse it to him. The interval between work assignments is a normal incident of his employment. The longshore work that each claimant regularly performed for the various members of the employers' association, and to which he had an exclusive right was "his work" within the meaning of section 56(a). That work cannot be taken from him except by joint action of his union and the employers' association acting through the Joint Labor Rela-

tions Committee. It was this work that claimants left when they refused to perform it during the ship clerks' strike.

The commission's interpretation of "establishment" as each place of business of each employer, however apt it may be generally, does not fit the facts in the present case. The longshoremen's work and its locale are governed by contract. One of the objects of the contract was the abolition of the system that normally prevailed when some longshoremen worked regularly for one employer while others had only occasional work. Under the contract all registered longshoremen are assigned through the hiring hall to all the work of all the employers. As applied to these facts the term "establishment" as used in section 56(a) means the place of employment, namely, the various docks covered by the contract, where the longshoremen customarily work. This was the area covered by the ship clerks' strike. The disqualification of the claimants therefore continued for the period covered by that strike. That the Legislature did not intend that the payment or withholding of benefits should turn on nice distinctions in the definition of words like "employed" and "establishment" is evident from section 1 of the act: "As a guide to the interpretation and application of this act the public policy of this State is declared as follows: . . . The Legislature therefore declares that in its considered judgment the public good and the general welfare of the citizens of the State require the enactment of this measure under the police power of the State, for the compulsory setting aside of funds to be used for a system of unemployment insurance providing benefits for persons unemployed through no fault of their own, and to reduce involuntary unemployment and the suffering caused thereby to a minimum." The act establishes a policy of neutrality in trade disputes by provisions that the payment or withholding of benefits should not be used to aid either party to a trade dispute. Thus the provision disqualifying a worker who leaves his work because of a trade dispute § 56(a) is balanced by the provision that other unemployed workers shall not be required to fill the vacated jobs or lose their right to unemployment insurance benefits. (§ 13(b) (1).) The payment of benefits to a claimant who leaves his work because of a trade dispute would conflict with this policy just as would the withholding of payments because a claimant refused to become a strikebreaker.

As all the claimants in this case left their work because of a trade dispute, they are disqualified under section 56(a) from receiving benefits for unemployment during the period of the dispute.

There remains for consideration the question whether the employees, though not entitled to an award of unemployment benefits under the act, should nevertheless receive them because an initial award was affirmed by the referee. Section 67 of the act provides that "If a referee affirms an initial determination allowing benefits, such benefits shall be paid regardless of any appeal that thereafter may be taken." The interveners contend that under this provision they are entitled to receive payments from the time of the double affirmance, whether the award was right or wrong. The petitioners contend that, whatever the rights of the employees before the final determination herein, no payments can now be made under section 67 if it is finally decided that the employees are ineligible therefor. The answer to this question cannot be found in either the language of the act, or any decision to which our attention has been called; it must, therefore, be arrived at by a consideration of the legislative purpose in enacting section 67, and of the general law applicable to mistaken or unauthorized payment of money.

It was conclusively decided in *Abelleira* v. *District Court of Appeal*, 17 Cal.2d 280, 298 [109 P.2d 942, 132 A.L.R. 715], that section 67 is a valid provision. The court there declared that the purpose of the provision was to provide prompt payments to alleviate the distress of unemployment, whatever the issues of law or fact that might be involved in any appeal from or review of the referee's decision. Under that decision, employees are entitled to payments immediately upon the referee's affirmance of the initial determination, even though an appeal to the commission itself is pending, or a proceeding in review, proper or improper, is pending before a court. The court also took occasion to indicate the necessity and reasonableness of such a provision, noting the likelihood that for the most part the awards will be correct, and that to permit them to be withheld for months or years by appeals and court proceedings would defeat the objects of the statute.

It might be concluded that the payments in the instant case, which should have been made upon the referee's affirm-

ance but were not, should be made without further delay. In this case, however, there are two factors, not present in the Abelleira case: The commission itself vacated and set aside the decision of the referee and transferred the matter to itself for determination, and this court has now decided finally that the employees were not entitled to the payments under the terms of the act.

A consideration of the first factor must start with the proposition that the commission has the power to vacate a decision of the referee. Section 72 provides: ''Any party to a decision by a referee may appeal to the commission from such decision. The commission may on its own motion affirm, modify, or set aside any decision of a referee on the basis of the evidence previously submitted in such case, or direct the taking of additional evidence. The commission may remove to itself or transfer to another referee the proceedings on any claim pending before a referee.'' This section separately provides that a party may appeal to the commission and that the commission may act on its own motion. There is nothing to indicate that the commission may not act of its own motion though an appeal is pending. Once it has vacated the decision of the referee, section 67 ceases to be applicable, for the vacated decision of the referee is a nullity and cannot operate as the second affirmance of the award. It is consonant with the spirit of the statute that the commission should be permitted to administer the act without interference by the courts in its intermediate determinations. Since the commission itself acts in a supervisory capacity in reviewing the referee's determination, and may deliberate at some length in its consideration of any appeal to it, there is good reason to deny a stay, and to require payments to be made, pending decision on that appeal. There is, however, the possibility of a serious evil in this normal procedure, namely, that large groups of claimants could claim and obtain substantial sums in violation of the terms and objects of the statute. The act could not long survive if its purposes were thus distorted, and it is essential, in an unusual situation involving serious questions of law and large amounts of money, that the commission step in and take over the case from the referee for its own consideration. The commission has the responsibility of administering the funds in accord with the statute, and to do so it must exercise reasonable supervision over its ref-

erees. It is for the commission to determine what cases are of enough importance to justify a departure from the ordinary procedure of appeal. It, therefore, follows that, although payments should start immediately upon the referee's affirmance, they can be stopped at any time the commission chooses to exercise this extraordinary power of vacating the referee's decision, and can be prevented entirely if the commission acts immediately to vacate the decision. The commission's power to limit the payment of benefits must be considered in the light of where the alternative course would lead. If the *interpretation* and *administration* of the act were left to the referees instead of to the commission, any referee would have unrestricted power to distinguish, interpret or even disregard in later cases a controlling decision of the commission or the courts laid down as a precedent to govern future action. Despite any disciplinary action that might be taken against the referee, the commission would be powerless to stop illegal payments until an appeal was filed, brought to a hearing, and decided.

The second factor that distinguishes this case from the Abelleira case is the final determination by this court that the awards were unauthorized. If the commission's action in vacating the referee's decision is disregarded, there results the paradox that the claimants should receive payments under section 67, even though they are not entitled under the act to any payments. The claimants contend that the silence of the Legislature in this regard indicates an intention that the payments be made, rightly or wrongly. Under this interpretation, the detailed substantive provisions of the statute would be subordinated to the procedural provisions of section 67, and the award would be based, not on compliance with the terms of the act, but on a successful argument to a referee. Those who convince Referee A would be entitled to unemployment benefits; those who, in a similar situation, fail to convince Referee B would not be entitled to benefits. A legal right to public moneys cannot be based on such a dubious combination of an administrative officer's error and an obscurely worded statutory provision. The right to have payments begin upon a provisional determination of their correctness in no way establishes a right to payments once their impropriety is finally determined. (*Cf. Baldwin* v. *Scott*

*County Milling Co.,* 307 U.S. 478 [59 S.Ct. 943, 83 L.Ed. 1409].)

 In accord with the statute as interpreted in the Abelleira case, payments must be made pursuant to the referee's determination. If subsequently, however, by a decision of the commission on appeal or by a court on review, the payments are found to be unauthorized and illegal, section 67 does not make them valid. That section merely prevents a stay; it does not create a substantive right. Since the provision against stay does not create any rights in conflict with the substantive provisions of the statute, there is no ground upon which the illegal awards can be paid.

It may be added that this decision is in complete accord with the holding in the Abelleira case, *supra,* that there is no justification for any interference by the courts with the commission's proceedings, before its final decision, and that prohibition will lie to prevent it. It follows also from the decision herein that the proper procedure to prevent serious violation of the conditions governing payment of benefits is to seek the intervention of the commission itself to vacate the referee's determination. Otherwise there can be no stay of enforcement of the award, and mandamus may be sought to compel its payment.

Let a peremptory writ issue as prayed.

Gibson, C. J., Shenk, J., Curtis, J., and Edmonds, J., concurred.

CARTER, J.—I dissent. In my opinion the employees here involved were entitled to the payment of unemployment insurance benefits upon the affirmance of the allowance of such benefits to them by the referee pursuant to the provisions of section 67 of the California Unemployment Insurance Act. The holding of the majority opinion to the contrary in effect nullifies the provisions of section 67 of said act which were designed "to carry out the policy declared in section 1 of alleviating the evils of unemployment, as part of a national plan of social security in which federal and state legislation is coupled," and overrules the case of *Abelleira* v. *District Court of Appeal,* 17 Cal.2d 280 [109 P.2d 942, 132 A.L.R. 715] although it purports to rely upon this case in support of its conclusion. The majority opinion states: "In accord with

the statute as interpreted in the Abelleira case, payments must be made pursuant to the referee's determination. If subsequently, however, by a decision of the commission on appeal, or by a court on review, the payments are found to be unauthorized and illegal, section 67 does not make them valid. That section merely prevents a stay; it does not create a substantive right. Since the provision against stay does not create any rights in conflict with the substantive provisions of the statute, there is no ground upon which the illegal awards can be paid.''

Section 67 of the California Unemployment Insurance Act, after providing for a hearing and initial determination of a claim for benefits and an appeal therefrom reads: ''If a referee affirms an initial determination allowing benefits, such benefits shall be paid regardless of any appeal which may thereafter be taken, but if such determination is finally reversed no employer's account shall be charged with benefits so paid as to each such determination so reversed.''

The foregoing provision was interpreted by this court in the Abelleira case, and the holding in the case at bar is squarely contrary to the reasoning therein. It is said in the Abelleira case at page 298:

''This [referring to the provision in section 67] is one of the most significant statements in the act. In substance it provides that when the initial determination has been reviewed and approved by the intermediate appellate authority (the referee), no further delay in *payment* shall be permitted even though the issues may be still further considered in a subsequent appeal. It *was designed to carry out the policy declared in section 1 of alleviating the evils of unemployment*, as part of a national plan of social security in which federal and state legislation is coupled. (Sec. 2.) *The very essence of the act is its provision for the prompt payment of benefits to those unemployed.* (See 88 Univ.Pa.L.Rev. 137, 139.) *Any substantial delay would defeat this purpose and would bring back the very evil sought to be avoided.* The legislature, recognizing the importance on the one hand of avoiding improvident payments without due consideration of the right thereto, and the *danger on the other hand of withholding the payments* for long periods through the slow processes of appeal to the commission and perhaps eventually to the courts, took a middle course. It provided for a preliminary appeal or

review of the first determination where payments were ordered. This appeal, ordinarily decided in a short period of time, carries with it a stay. But when this second decision has also been made in favor of the applicants, the benefits begin, with protection, as already noted, for the employer in the event of later reversal. . . . But in truth there is nothing unusual in the provision, which is in force in some thirty-six of the states. The legislature has concluded on the basis of normal experience that the *large majority of the administrative orders will be proper, and that to permit these justifiable and necessary payments to be postponed for long periods would defeat the objectives of the act.* . . .

"The foregoing cases demonstrate the weakness of the argument that because a commission may make an occasional error in ordering some payment out of a public or semi-public fund, the courts must have the power to stay any and all payments during the lengthy period of judicial review. *The legislature has concluded that it is wiser to have a system of unemployment compensation operating with a possible small percentage of error, than to have a system not operating at all.* The legislative power to make such provision is unquestioned; the statutory language cannot be misunderstood; and for the courts that is the end of the matter." (Italics added.) It is to be noted that great stress is laid upon the necessity of prompt payment and that the payments shall continue during appeal, otherwise the *whole purpose of the act will be frustrated;* that the Legislature chose to accept the *risk* of annullment of the order for payment of benefits believing that the probabilities were such that the great majority of the claims would be decided correctly.

The majority opinion states that it agrees with the Abelleira case, and then proceeds to hold that benefits need not be paid upon the affirmance of an allowance by a referee. On the contrary, the Abelleira case held that the Legislature chose to run the risk of the few instances in which an allowance of benefits, affirmed by a referee, would be found erroneous, and that, therefore, payment should be made upon such affirmance. The wording of the statute itself admits of but one interpretation. It states that the benefits *shall be paid regardless* of any appeal. Certainly the appeal em-

braces a decision on appeal. The sole requirement is that the initial allowance of the claim for benefits be affirmed by the referee. There is no requirement that it be *correct* or found to be correct on appeal, and, as pointed out in the Abelleira case, the Legislature *assumed the risk* of the relatively few cases which would be incorrectly decided.

The conclusion reached in the majority opinion in support of its position that benefits need not be paid upon the affirmance of an allowance by a referee is based upon the obviously unsound premise that "that section (67) merely prevents a stay; it does not create a substantive right. Since the provision against stay does not create any rights in conflict with the substantive provisions of the statute, there is no ground upon which the illegal awards can be paid." No authority is cited for the foregoing statement and I doubt if any can be found. It cannot be denied that the above quoted provision of section 67 of the Unemployment Insurance Act creates a right to receive benefits under said act "if a referee affirms an initial determination allowing benefits." In other words, the act provides that upon such affirmance, "benefits shall be paid regardless of any appeal which may thereafter be taken." To say that such a provision does not create a substantive right, is to disregard the clear meaning of the plain language there used. Can it be said that the above quoted provision of section 67 does not create a right to receive benefits? The answer is obvious that it does create such right. Can it be said that such right is not a substantive right? The answer to this question is also obvious that such right is a substantive right. This must be so if the Unemployment Insurance Act creates anything in the nature of a substantive right in favor of those unemployed.

A substantive right is contrasted with a remedial right. It is said in Black's Law Dictionary (3d ed.), page 1672, that substantive law is:

"That part of the law which the courts are established to administer, as opposed to the rules according to which the substantive law itself is administered. That part of the law which creates, defines, and regulates rights, as opposed to *adjective* or remedial law, which prescribes the method of enforcing rights or obtaining redress for their invasion." Here the act expressly and unconditionally *gives a right—*

the right to receive payment of the benefits. It is not a remedy, method, or rule by which a right is acquired. It is the right itself. No steps are required to obtain it. It is a granted right.

The payment of the benefit after affirmance by the referee is not *by the terms of the statute* wholly without limitation. Section 67 expressly provides that the employer's account shall not be charged if the allowance of the claim is finally reversed on appeal. Hence, the Legislature *did consider the question of what, if any, conditions should be imposed upon or result from the payment of benefits even though an appeal was taken.* It must be presumed that that condition was the sole one intended by the Legislature. If it had intended others it would have so stated. Its failure to do so clearly evinces an intent that it did not so intend. The rule of statutory construction stated in *In re De Neef,* 42 Cal.App. 2d 691, 694 [109 P.2d 741], is applicable:

"Thus we are confronted with two well known rules of statutory construction—that when the language of a statute is clear and unambiguous it does not permit judicial interpretation or construction; and that, *when the statute itself specifies its exceptions, no other may be added under the guise of judicial construction.*" (Italics added.) And in *Perkins* v. *Thornburgh,* 10 Cal. 189, 191:

"It will be seen that the Code itself states the effect of the verdict, if in favor of the claimant. It also states the effect of the verdict, if against the claimant, *as to costs. When a statute assumes to specify the effects of a certain provision, we must presume that all the effects intended by the law-maker are stated.* (*Lee* v. *Evans,* 8 Cal.Rep., 424; *Bird* v. *Dennison,* 7 Cal.Rep. [297], 307; *Melony* v. *Whitman,* [*People* v. *Whitman*] page 38 of this volume.)" (Italics added.) (See also *Duncan* v. *Superior Court,* 104 Cal.App. 218 [285 P. 732].

Concerning the question of whether or not, in the instant case, the employees should be entitled to the benefits which should have been paid but were not prior to the reversal on appeal there are several persuasive arguments why the employees should be entitled thereto. First, the purpose of the act, that is, to have prompt payments regardless of an appeal will be thwarted if they are not so made. The officials administering the act will be wholly free at their whim or

caprice to defeat that purpose by merely failing to make the payments or by the action of the commission in setting aside the referee's affirmance of the initial allowance. Certainly the Legislature did not intend that the *main,* and as expressed in the Abelleira case, the most important part of the act should rest upon such a precarious basis. Second, the benefits must be paid "regardless of any appeal." That phrase clearly embraces the decision on appeal. Paraphrasing, it would read that the benefits are payable regardless of a *reversal on appeal.* In other words there was an absolute obligation to pay, and the Legislature chose to assume the risk of error by the referee. (*Abelleira* v. *District Court of Appeal, supra.*) Third, the above discussed rule of statutory construction applies, namely, that the only limitation attached to the payment was in respect to the employer's account. The expression of that condition eliminates others and others may not be added by judicial construction.

From what I have said in the foregoing opinion, it follows that the employees here involved were entitled to unemployment insurance benefits from the date of the affirmance of the award in their favor by the referee and that such benefits should be paid until the final determination by this court that they were not entitled thereto.

Schauer, J., concurred.

Interveners' petition for a rehearing was denied September 13, 1944. Carter, J., and Schauer, J., voted for a rehearing.