216 P.3d 108

DISTRICT COUNCIL 50, OF the INTER-
NATIONAL UNION OF PAINTERS
AND ALLIED TRADES and Aloha
Glass Sales & Service, Inc., Plaintiffs–
Appellants,

v.

Russ K. SAITO, in his capacity as Di-
rector, Department of Accounting and
General Services; Patricia Hamamoto,
in her capacity as Superintendent, De-
partment of Education; State of Ha-
wai'i, Defendants–Appellees,

John Does 1–10; Jane Does 1–10; Doe Cor-
porations 1–10; Doe Partnerships 1–10;
Doe Governmental Agencies 1–10; Doe
Trusts 1–10, Defendants.

No. 27927.

Intermediate Court of Appeals of Hawai'i.

Aug. 31, 2009.

Michael A. Lilly (Ning, Lilly & Jones),
Honolulu, for Plaintiffs–Appellants.

Aaron H. Schulaner, Holly T. Shikada, Deputy Attorneys General, for Defendants–Appellees.

FOLEY, Presiding Judge, FUJISE and LEONARD, JJ.

### Opinion of the Court by FUJISE, J.

This case arises out of the award of a capital improvements contract to a general contractor without certain specialty licenses. It comes before this court to review the judgment and order entered by the Circuit Court of the First Circuit (circuit court)[1] ruling that it lacked jurisdiction over the matter.

### I.

On January 31, 2005, the State of Hawai'i Department of Accounting and General Services (DAGS) issued a notice to bidders requesting sealed bids for job number 52–16–5581, a public works project to renovate and paint various buildings at Lanakila Elementary School (Project). To be eligible, the bidder was required to hold a "State of Hawaii Contractor's license classification B."[2]

Pertinent to this appeal, the Project involved the installation of aluminum jalousie windows (jalousies). The Project specifications contained detailed requirements for the manufacture and installation of the jalousies. The bids were opened on March 3, 2005, and Allied Pacific Builders (Allied) was the lowest bidder on the Project.

Allied held a class "B" contracting license. When Allied bid on the Project, it filled out a form indicating all of the specialty licenses it

---

1. The Honorable Bert I. Ayabe presided.

2. Hawaii Revised Statutes (HRS) § 444–7 (1993) describes the various classifications of contractor's licenses:

 Classification. (a) For the purpose of classification, the contracting business includes any or all of the following branches:
 (1) General engineering contracting;
 (2) General building contracting;
 (3) Specialty contracting.
 (b) A general engineering contractor is a contractor whose principal contracting business is in connection with fixed works requiring specialized engineering knowledge and skill, including the following divisions or subjects: irrigation, drainage, water power, water supply, flood control, inland waterways, harbors, docks and wharves, shipyards and ports, dams and hydroelectric projects, levees, river control and reclamation works, railroads, highways, streets and roads, tunnels, airports and airways, sewers and sewage disposal plants and systems, waste reduction plants, bridges, overpasses, underpasses and other similar works, pipelines and other systems for the transmission of petroleum and other liquid or gaseous substances, parks, playgrounds and other recreational works, refineries, chemical plants and similar industrial plants requiring specialized engineering knowledge and skill, powerhouses, power plants and other utility plants and installations, mines and metallurgical plants, land levelling and earth-moving projects, excavating, grading, trenching, paving and surfacing work and cement and concrete works in connection with the above mentioned fixed works.
 (c) A general building contractor is a contractor whose principal contracting business is in connection with any structure built, being built, or to be built, for the support, shelter, and enclosure of persons, animals, chattels, or movable property of any kind, requiring in its construction the use of more than two unrelated building trades or crafts, or to do or superintend the whole or any part thereof.
 (d) A specialty contractor is a contractor whose operations as such are the performance of construction work requiring special skill such as, but not limited to, electrical, drywall, painting and decorating, landscaping, flooring, carpet laying by any installation method, plumbing, or roofing work, and others whose principal contracting business involves the use of specialized building trades or crafts.

 HRS § 444–7 (1993). Hawaii Administrative Rules (HAR) § 16–77–28 provides,
 *All contractors classified.* (a) All persons licensed under chapter 444, HRS, shall be classified by the board into one or more classifications or subclassifications, or both, as follows:

 | | |
 |---|---|
 | General engineering contractor | "A" |
 | General building contractor | "B" |
 | Specialty contractor | "C" |

 (b) The definitions of these classifications shall be as provided in section 444–7, HRS.
 (c) Exhibit A, entitled Specialty Contractor Classifications, dated May 23, 2003, located at the end of this chapter, is hereby incorporated into and made a part of this chapter.
 (d) Classifications under C–68 classified specialist may be established by the board until the work performed is defined and a hearing is held to establish the proper classification. A C–68 classified specialist shall be subject to the same requirements as other contractor classifications.
 (e) The board, after a hearing, may establish or modify or delete existing classifications, based on established usage in the construction industry.

or its subcontractors possessed.[3] Allied did not indicate that it held a C–22 glazing and tinting specialty license, nor did it list a subcontractor holding such a license,[4] on the bid form. Whether the winning bidder should have been required to hold such a license or list such a subcontractor was the subject of the underlying dispute in this case.

BCP Construction of Hawaii, Inc. (BCP) was also a bidder for the job and submitted the next lowest bid. On March 7, 2005, BCP wrote a letter of protest to DAGS. In BCP's view, because Allied "did not list a C–22 (GLAZING) contractor to install the new [jalousies] . . . their bid should be considered non responsive [sic] and rejected by the State of Hawaii." On March 17, 2005, Allied requested that the Contractors License Board for the State of Hawai'i (CLB) issue a ruling on whether Allied was "qualified to complete the replacement of the [jalousies] as specified for this [Project]." On March 21, 2005, the CLB responded,

> Based solely on the information you provided, the Board determined that if the renovation work performed by the "B" General Building contractor falls within the scope of the C–5 Cabinet, millwork, and carpentry remodeling and repairs classification,[5] and the replacement of alumi-

num jalousie windows is part of the renovation work, then the jalousie work may be performed by the "B" General Building contractor.

> In accordance with Section 16–201–90, [HAR], the above interpretation is for informational and explanatory purposes only. It is not an official opinion or decision and thus is not binding on the Board.

> If a formal or binding opinion is requested, a petition for declaratory relief must be filed with the Board. . . .

Aloha Glass Sales & Service, Inc., Plaintiff–Appellant herein, (Aloha Glass) was a subcontractor listed by another bidder for the Project. In a May 16, 2005 letter to DAGS, Aloha Glass explained its belief that Allied did not hold a C–22 license, no C–22 specialty contractor was listed on the bid form, and the jalousie-installation work constituted more than 1% of the Project and therefore called for a C–22 license. Aloha Glass then asked whether DAGS "[w]ill disqualify [sic] their bid?" On May 20, 2005, DAGS responded:

> The [Project] is currently under a protest on the low bidder's failure to list a C–22 glazing subcontractor for the replacement of the aluminum jalousie windows and a C–

---

**3.** These were in addition to the licenses a "B" Contractor automatically holds, as provided by HAR § 16–77–32:

> Licensees who hold the "B" general building contractor classification shall automatically hold the following specialty classifications without further examination or paying additional fees:

(1) C–5 cabinet, millwork, and carpentry remodeling and repairs;
(2) C–6 carpentry framing;
(3) C–1 scaffolding;
(4) C–12 drywall;
(5) C–24 building moving and wrecking;
(6) C–25 institutional and commercial equipment;
(7) C–31a cement concrete;
(8) C–32a wood and vinyl fencing;
(9) C–42a aluminum and other metal shingles;
(10) C–42b wood shingles and wood shakes.

**4.** HAR § 16–77–28(c) incorporates Exhibit A, Specialty Contractor Specifications, which defines the scope of a C–22 license:

> C–22 **Glazing and tinting contractor.** To glaze or tint frames, panels, sash, and doors. To assemble and install window wall and curtain wall, shower doors, tub enclosures,

mirrors, metal windows and screens, metal sliding doors, metal jalousies, store front metal and trim, plastics, tempered glass doors; including items such as frames and hardware and any allied products not stated above but affiliated with the glass and glazing industry[.]

**5.** A C–5 license allows the licensee

> To install cabinets, cases, sashes, doors, trims, or nonbearing partitions that become a permanent part of structure, and to remodel or to make repairs to existing buildings or structures, or both; and to do any other work which would be incidental and supplemental to the remodeling or repairing. The repairs, carpentry work, or remodeling shall include the installation of window shutters, garage doors, bifold, and shutter doors; and the installation of manufactured sidings and any other work that would not involve changes or additions to the building's or structure's basic components such as, but not limited to, foundations, beams, rafters, joists, or any load bearing members or sections[.]

HAR § 16–77–28(c) and Exhibit A attached thereto.

51[6] ceramic tile subcontractor for the ceramic tile work. Previous inquiry to the [CLB] has provided informational and explanatory interpretation that the B general building contractor may, under their C–5 cabinet, millwork, and carpentry remodeling and repairs classification, do the replacement of aluminum jalousie windows which is part of the renovation work. This is currently still their position although it is not binding on the board.

DAGS will follow their interpretation in reviewing the subcontractor listing.

On July 1, 2005, the administration of the contract was transferred from DAGS to the State of Hawai'i Department of Education (DOE).

On July 15, 2005, DAGS petitioned the CLB for a "formal interpretation on what is incidental and supplemental work that can be performed by 'B' General building contractor. . . ." On September 8, 2005, District Council 50 of the International Union of Painters and Allied Trades, Plaintiff–Appellant herein, (DC 50) moved to intervene. DC 50 is a union representing the painters, glaziers and glass workers, carpet and soft tile installers, and drywall finishers of Hawai'i. DC 50 claimed that it was "compelled to intervene on behalf of the glaziers and carpet layers to protect their interests[.]" DC 50 requested that the CLB find that a "B" General Building Contractor with its automatic C–5 license could not perform, *inter alia*, the kind of work covered by a C–22 license.

On September 8, 2005, a hearing before the CLB was set for October 18, 2005. However, on September 28, 2005, DAGS withdrew its petition for declaratory relief.

On November 15, 2005, DOE responded to BCP's March 7, 2005 letter, informing BCP that it had taken control over the Project and would proceed with the bid: "In reviewing the unofficial opinion of the [CLB] dated March 21, 2005, the [DOE] views that installation of the [jalousies] is permissible under the C–5 license." Thus, the DOE "dismissed" BCP's "concerns" and stated that the DOE "intends to proceed with award of this solicitation based upon the bid results."

On November 21, 2005, BCP again wrote to the DOE, stating that,

[i]t was our intended and now official statement that there is "GLAZING" involved in this project and the apparent low bidder does not posses this "SPECIALTY" C–22 (Glazing) license as required to perform the glazing work as identified in . . . [the project specifications].

BCP also requested a "complete 'OFFICIAL' review of our position and a response prior to the award of this [Project]. . . ."

The DOE responded on December 19, 2005, stating,

pursuant to the requirements of the Okada Trucking decision, the acceptance of the bid is in the best interests of the State; and the value of the work to be performed by the joint contractor is equal to or less than one percent of the total bid amount. Under the foregoing analysis, the apparent low bid is accepted. Notice of award shall be issued on December 20, 2005. Subject to HAR § 3–126–4 you have 5 working days from this date to file an official protest.

On December 21, 2005, BCP submitted an official protest to the DOE. BCP requested an official review of its position that Allied could not be awarded the contract for the failure to list certain specialty licenses. On January 10, 2006, the DOE denied BCP's protest because

the work in dispute is equal to or less than once [sic] percent of the total bid value. In addition, the inclusion of a specialty licensed subcontractor would add unnecessary cost and complexity to the [Project]. As such, the acceptance of the low bid is in the best interests of the State.

The DOE informed BCP[7] that it had the right to "administrative proceedings pursuant to subchapter 5 or the filing of a request

---

6. Plaintiffs' complaint does not include a claim involving C–51 license work.

7. The DOE also stated that it was denying "your protest dated May 10, 2005." However, no May 10, 2005 protest by BCP or any other party appears of record.

for hearing with the Office of Administrative Hearing, Department of Commerce and Consumer Affairs within seven calendar days." No appeal or request for administrative hearing from this decision appears in the record before this court.

On January 24, 2006, DC 50 and Aloha Glass (collectively Plaintiffs) filed the underlying complaint against Russ K. Saito, the State Comptroller and the head of DAGS, Patricia Hamamoto, DOE Superintendent, and the State of Hawai'i (collectively Defendants). On February 10, 2006, Plaintiffs filed a First Amended Complaint, requesting the following relief:

1. Issue temporary and permanent injunctions against the Defendants, prohibiting them from:

a. allowing a general engineering [sic] contractor to expand the scope of work on a public works project similar to a specialty contractor which may engage in "incidental and supplemental" work in trades or crafts in which it is not licensed;

b. accepting bids from a contractor for a public works contract who has failed to name each person or firm to be engaged by the bidder as a subcontractor in the performance of the contract and the nature and scope of work to be performed by each where it is not in the best interest of the State and the value of the work to be performed by the joint contractor or subcontractor is not equal to or less than one per cent of the total bid amount; and

c. awarding the Project to Allied.

2. Order that the Project be awarded to the next responsive bidder.

3. Award any damages, attorneys' fees and costs to which the Plaintiffs would be entitled.

4. Grant any other relief it finds just and proper.

Defendants filed a Motion to Dismiss or in the Alternative for Summary Judgment (Motion) which Plaintiffs opposed. At the March 2, 2006 hearing on this Motion, Defendants argued that HRS Chapter 103D, the Public Procurement Code (Procurement Code), was the appropriate vehicle for a dispute over procurements and that questions regarding the scope of a contractor's license could be pursued under HRS Chapter 444 regarding Contractors (Chapter 444). Both chapters, they argued, have administrative procedures available. However, Defendants pointed out, neither administrative procedure was invoked by Plaintiffs.

Plaintiffs countered that there was no requirement that every administrative procedure must be exhausted before seeking injunctive relief from the circuit court and denied that the Department of Commerce and Consumer Affairs had "exclusive jurisdiction over this case." Plaintiffs conceded that they had no standing to bring a contest under the Procurement Code but argued that, if this lack of standing prevented them from bringing suit, "a whole bunch of interested persons" would be left without a remedy. Plaintiffs also admitted that they could seek an administrative declaratory ruling pursuant to HRS Chapter 444, but maintained that such an effort would be futile as "there's no guarantee that such a remedy will come in time."

The circuit court entered its order granting Defendants' Motion on March 10, 2006, ruling that "Plaintiffs have failed to exhaust their administrative remedies, in that they are able to proceed through the procedures established in Chapter 444, [HRS], to obtain an administrative remedy. As such, the Court does not have jurisdiction in this matter." Final Judgment was entered on April 11, 2006, and Plaintiffs brought this timely appeal.

## II.

■ Plaintiffs challenge, in their single point on appeal, the circuit court's ruling that Plaintiffs were required to exhaust their administrative remedies under HRS Chapter 444 before bringing the instant lawsuit and, as Plaintiffs had not done so, the circuit court lacked jurisdiction to consider Plaintiffs' case. "A trial court's dismissal for lack of subject matter jurisdiction is a question of law, reviewable de novo." *Casumpang v. ILWU, Local 142*, 94 Hawai'i 330, 337, 13 P.3d 1235, 1242 (2000).

The doctrine of exhaustion of remedies in the field of administrative law holds that where a remedy is available from an administrative agency, that remedy must be exhausted before the courts will act to afford relief.

"Judicial review of agency action will not be available unless the party affected has taken advantage of all the corrective procedures provided for in the administrative process."

*Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 93, 734 P.2d 161, 169 (1987) (quoting B. Schwartz, ADMINISTRATIVE LAW § 8.30, 502 (2d ed.1984)).

Where, however, no administrative procedures are provided for an aggrieved party to seek a remedy, the aggrieved party may apply directly to the court for relief. *Northern Boiler Co. v. David,* 105 N.E.2d 451 (Ohio App.1951). The statute, ordinance or regulation under which the agency exercises its power must establish "clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties." *Rosenfield v. Malcolm,* 65 Cal.2d 559, 566, 55 Cal. Rptr. 505, 509, 421 P.2d 697, 701 (1967). Where the administrative machinery is not provided, the power of the court is not ousted by a claim of failure to exhaust administrative remedies. *Matson Terminals v. California Employment Comm'n,* 24 Cal.2d 695, 151 P.2d 202 (1944). Examination of the record in this case indicates that no administrative recourse was afforded to Plaintiffs.

*Pele Defense Fund v. Puna Geothermal Venture,* 9 Haw.App. 143, 151–52, 827 P.2d 1149, 1154 (1992) (noting that the plaintiffs did not challenge the agency's issuance of a permit but questioned whether a condition of that permit had been met).

Similarly, Plaintiffs here did not challenge the action of the CLB nor did Plaintiffs seek enforcement of the licensing provisions of Chapter 444. Plaintiffs' lawsuit is based on their contention that it was unlawful [8] for any "government agency in Hawaii" to (1) permit "a specialty contractor to engage in 'incidental and supplemental' work in trades or crafts in which it is not licensed to similarly expand the scope of work in which a general engineering [sic] contractor may engage on any public project[,]" and (2)

accept bids from a contractor for a public works contract who has failed to name each person or firm to be engaged by the bidder as a subcontractor in the performance of the contract and the nature and scope of work to be performed by each where it is not in the best interest of the State and the value of the work to be performed by the joint contractor or subcontractor is not equal to or less than one per cent of the total bid amount.

Consequently, Plaintiffs asked that the circuit court issue an injunction preventing Defendants from allowing the general contractor from expanding the scope of its work to tasks for which a specialty contractor's license was required, accepting bids without all specialty contractors who would do work on the job being listed, and awarding the contract in question to Allied. Plaintiffs also asked that the contract in question be awarded to the next lowest bidder.

It is true that Chapter 444 governs the licensing and conduct of contractors.

Enactment of HRS ch. 444 has established a comprehensive statutory scheme for regulating the contracting business within the State of Hawaii. All persons who wish to engage in the contracting business, including specialty contractors ... must first obtain a state license, issued by a state agency, the [CLB]. The licensing board is vested with broad powers relative to the licensing and regulating of contractors. It may promulgate regulations and "investigate, classify and qualify applicants for contractors['] licenses." Furthermore, in addition to licensing only those who prove themselves qualified for engaging in the contracting business, the State has provided detailed procedures for disciplining those who prove incompetent or unworthy of the trust placed in them.

*In re Application of Anamizu,* 52 Haw. 550, 554, 481 P.2d 116, 118 (1971). Chapter 444 provides that, "[n]o person within the pur-

---

**8.** We note that Plaintiffs provided no authority in their complaint for this contention.

view of this chapter shall act, or assume to act, or advertise, as a general engineering contractor, general building contractor, or specialty contractor without a license previously obtained under and in compliance with this chapter and the rules and regulations of the contractors license board." HRS § 444-9 (1993).

However, Chapter 444 does not authorize the CLB to reformulate contracts, dictate to whom those contracts should be awarded, or require changes in the bidding process. Rather, Chapter 444 vests in the CLB the authority to "[e]nforce this chapter and rules adopted pursuant thereto" and to "[s]uspend or revoke any license for any cause prescribed by this chapter, or for any violation of the rules, and [to] refuse to grant, renew, restore, or reinstate any license for any cause which would be grounds for revocation or suspension of a license[.]" HRS § 444-4(4) and (5) (Supp.2008).

Chapter 444 provides that "[i]n addition to any other remedy available," persons "acting in the capacity of or engaging in the business of a contractor within the State, without having a license previously obtained under and in compliance with this chapter and the rules promulgated thereunder" may be cited and sanctioned for unlicensed activity. HRS § 444-10.5 (1993 & Supp.2008). Other enforcement tools and remedies include the imposition of fines under HRS § 444-23 (Supp.2008), as well as criminal penalties under HRS § 444-9.3 (1993) (to allow one's license to be used by an unlicensed person) and § 444-10.7 (Supp.2008). In addition, HRS § 444-22 (1993 & Supp.2008) prevents recovery of the value of materials or services rendered by any person in violation of the chapter and HRS § 444-26 (Supp.2008) provides for a contractors recovery fund for persons injured by licensed contractors.

It is also true that Chapter 444 authorizes the CLB to "apply to a circuit judge for a preliminary or permanent injunction restraining any person from acting, or assuming to act, or advertising, as [a] general engineering contractor, general building contractor, or specialty contractor, without a license[.]" HRS § 444-24 (1993). However, Plaintiffs did not seek an injunction for this purpose.[9]

■ Conversely, the Procurement Code does provide for Plaintiffs' remedies. The Procurement Code applies, with exceptions not relevant here, "to all procurement contracts made by governmental bodies[.]" HRS § 103D-102(a) (2006). At all times relevant to this case, for the purposes of the Procurement Code, a contract "means all types of agreements, regardless of what they may be called, ... for construction[,]" construction "means the process of building, altering, repairing, improving or demolishing any public structure or building, or other public improvements of any kind to any public real property[,]" a contractor "means any person having a contract with a governmental body[,]" and a responsive bidder "means a person who has submitted a bid which conforms in all material respects to the invitation for bids." HRS § 103D-104 (Supp. 2008).

Any actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation or award of a contract may protest to the chief procurement officer or a designee as specified in the solicitation. Except as provided in sections 103D-303 and 103D-304, a protest shall be submitted in writing within five working days after the aggrieved person knows or should have known of the facts giving rise thereto; provided that a protest of an award or proposed award shall in any event be submitted in writing within five

9. Nor do Plaintiffs claim to be enforcing any other law in support of their request for an injunction. Indeed, Plaintiffs were not the proper parties to seek enforcement of Chapter 444 or any other law. HRS § 603-23 (Supp.2008), Injunction in violation of laws and ordinances, provides, as it did at the time this action was initiated,

The circuit courts shall have power to enjoin or prohibit any violation of the laws of the State, or of the ordinances of the various counties, upon application of the attorney general, the director of commerce and consumer affairs, or the various county attorneys, corporation counsels, or prosecuting attorneys, even if a criminal penalty is provided for violation of the laws or ordinances. Nothing herein limits the powers elsewhere conferred on circuit courts.

working days after the posting of award of the contract under section 103D–302 or 103D–303, if no request for debriefing has been made, as applicable; provided further that no protest based upon the content of the solicitation shall be considered unless it is submitted in writing prior to the date set for the receipt of offers.

HRS § 103D–701(a) (Supp.2008).

If a timely protest is filed, "no further action shall be taken on the solicitation or the award of the contract until the chief procurement officer makes a written determination that the award of the contract without delay is necessary to protect substantial interests of the State." HRS § 103D–701(f) (Supp. 2008). If a timely protest "is not resolved by mutual agreement, the chief procurement officer or designee shall promptly issue a decision in writing to uphold or deny the protest." HRS § 103D–701(c) (Supp.2008). "A decision under [HRS § 103D–701] subsection (c) shall be final and conclusive, unless any person adversely affected by the decision commences an administrative proceeding under section 103D–709." HRS § 103D–701(e) (Supp.2008). A hearing to review and determine any request for an administrative proceeding to review the actions of the chief procurement officer must be commenced within twenty-one calendar days of receipt of the request. HRS § 103D–709 (Supp.2008).

If a solicitation or proposed award is found in violation of law prior to the award of the contract, the solicitation or proposed award may be cancelled or revised to comply with the law. HRS § 103D–706 (1993). Remedies available for the award of a contract made in violation of the Procurement Code include ratification, termination or modification of the contract; declaring the contract null and void; and compensation for actual expenses. HRS § 103D–707 (Supp.2008).[10] Interest on amounts ultimately determined to be due to the contractor or the government is also authorized by the Procurement Code. HRS § 103D–708 (Supp.2008).

However, the procedures and remedies provided in the Procurement Code and rules adopted by the Procurement Policy Board established pursuant to HRS § 103D–201 "shall be the exclusive means available for persons aggrieved in connection with the solicitation or award of a contract, a suspension or debarment proceeding, or in connection with a contract controversy, to resolve their claims or differences." HRS § 103D–704 (Supp.2008).[11]

As a labor union and a subcontractor, Plaintiffs admit that they have no ability to invoke the provisions of the Procurement Code because they are neither contractors nor bidders for the contract in question. Thus, it is undisputed that Plaintiffs could

10. At all times relevant to these proceedings, HRS § 103D–707 provided,

**Remedies after an award.** If after an award it is determined that a solicitation or award of a contract is in violation of law, then:
(1) If the person awarded the contract has not acted fraudulently or in bad faith:
(A) The contract may be ratified and affirmed, or modified; provided it is determined that doing so is in the best interests of the State; or
(B) The contract may be terminated and the person awarded the contract shall be compensated for the actual expenses, other than attorney's fees, reasonably incurred under the contract, plus a reasonable profit, with such expenses and profit calculated not for the entire term of the contract but only to the point of termination;
(2) If the person awarded the contract has acted fraudulently or in bad faith:

(A) The contract may be declared null and void; or
(B) The contract may be ratified and affirmed, or modified, if the action is in the best interests of the State, without prejudice to the State's rights to such damages as may be appropriate.

11. At all times relevant to this case, HRS § 103D–704 provided,

**Exclusivity of remedies.** The procedures and remedies provided for in this part, and the rules adopted by the policy board, shall be the exclusive means available for persons aggrieved in connection with the solicitation or award of a contract, a suspension or debarment proceeding, or in connection with a contract controversy, to resolve their claims or differences. The contested case proceedings set out in chapter 91 shall not apply to protested solicitations and awards, debarments or suspensions, or the resolution of contract controversies.

not avail themselves of the remedies provided for in the Procurement Code.

Thus, the circuit court had no authority to grant Plaintiffs relief under the Procurement Code as they could not, and did not, exhaust administrative remedies provided by that chapter.

As neither the Procurement Code nor HRS Chapter 444 authorized the circuit court to grant the remedies Plaintiffs sought and the circuit court was presented with no other basis for granting the requested relief, the circuit court was correct in dismissing the lawsuit. *See* Hawai'i Rules of Civil Procedure Rule 12(b)(6).

Plaintiffs argue in their Reply Brief that while they did not have standing under the Procurement Code to lodge a protest,

> they had the right to file the complaint in the Circuit Court below. Namely, "(1) they have suffered an actual or threatened injury as a result of the [Defendants'] conduct; (2) the injury is traceable to the challenged action; and (3) the injury is likely to be remedied by a favorable judicial decision." *Mottl v. Miyahira,* 95 Hawai'i 381, 391, 23 P.3d 716, 726 (2001). *Mottl* dealt with the standing of union and legislators to challenge a decision to reduce the University of Hawaii's budget and it could not be shown that the budget reduction would have a specific negative effect on the plaintiffs. Unlike *Mottl,* Plaintiffs were directly injured in that the award to Allied Pacific precluded an award to a contractor with a C–22 licensed subcontractor. Further, the use of unlicensed individuals to perform C–22 work will have the effect of making the C–22 license obsolete, thereby injuring all C–22 subspecialty license holders.

Plaintiffs' argument is not persuasive. Plaintiffs have alleged only that there was a theoretical injury to all C–22 subspecialty licensed holders, not that they suffered an injury in fact. Aloha Glass does not even allege it was the C–22 subspecialty license holder for the next-lowest bidder, and as a labor organization, DC 50 is at least two steps removed from the procurement process since it represents the individual workers who in turn are employed by C–22 subspe-

cialty subcontractors who would do the C–22 classified work provided for in the contract. As such, neither Plaintiff has established the "injury in fact" required by *Mottl.* 95 Hawai'i at 393, 23 P.3d at 728 (faculty union, faculty members and legislators did not show injury in fact to challenge executive branch decision not to release funds to state university as they failed to show they "have, in fact, suffered a deterioration in their working conditions or any other detriment, actual or threatened, as a result of the defendants' actions").

 More importantly, Plaintiffs fail to explain why the Procurement Code's specific standing and exclusive remedy provisions, limiting challenges to bidders, offerors and contractors, does not foreclose this action. HRS §§ 103D–701(a) and 103D–704. These express and specific provisions manifest a clear intent on the part of the legislature to limit actions seeking redress for injury caused by the procurement process to those directly involved in that process. *Tax Appeal of County of Maui v. KM Hawaii Inc.,* 81 Hawai'i 248, 254, 915 P.2d 1349, 1355 (1996) (quoting *Sherman v. Sawyer,* 63 Haw. 55, 57, 621 P.2d 346, 348 (1980)) (it is "the legislature [that] has the power to establish the subject matter jurisdiction of our state court system") (internal quotation marks omitted).

Thus, neither of the statutes discussed by the parties support Plaintiffs' prayer for relief. While the circuit court dismissed Plaintiffs' complaint for failure to exhaust administrative remedies, we may affirm a correct result on any basis supported by the record. *Canalez v. Bob's Appliance Service Center, Inc.,* 89 Hawai'i 292, 301, 972 P.2d 295, 304 (1999).

### III.

The April 11, 2006 Final Judgment of the Circuit Court of the First Circuit is hereby affirmed.