23 P.3d 716

Michael MOTTL, Rod Tam, Chris Halford, David Miller, Diane Ferreira, and University of Hawaii Professional Assembly, Plaintiffs–Appellants,

v.

Neal MIYAHIRA, in his capacity as Director of Finance of the State of Hawai'i and Benjamin J. Cayetano, in his capacity as Governor of the State of Hawai'i, Defendants–Appellees.

No. 23603.

Supreme Court of Hawai'i.

May 25, 2001.

T. Anthony Gill (Wade C. Zukeran with him on the brief; Gill & Zukeran) on the

briefs, Honolulu, for the plaintiffs-appellants Michael Mottl, Rod Tam, Chris Halford, David Miller, Diane Ferreira, and University of Hawaii Professional Association.

Brian Aburano (Russell A. Suzuki on the brief), Deputy Attorney General, on the briefs, for the defendants-appellees Neal Miyahira and Benjamin J. Cayetano.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by LEVINSON, J.

The plaintiffs-appellants Michael Mottl, Rod Tam, Chris Halford, David Miller, Diane Ferreira, and the University of Hawaii Professional Assembly ("UHPA") [collectively, "the plaintiffs"] appeal from the first circuit court's final judgment filed on July 20, 2000, in favor of Earl I. Anzai, the predecessor of the defendant-appellee Neal Miyahira, in his capacity as then-director of finance of the State of Hawai'i,[1] and the defendant-appellee Benjamin J. Cayetano, in his capacity as the governor of the State of Hawai'i. The plaintiffs argue that the circuit court erred in denying their motion for summary judgment and granting the defendants' motion for summary judgment, pursuant to which the final judgment was entered, inasmuch as: (1) the statute on which the circuit court relied, Hawai'i Revised Statutes (HRS) § 37-37 (1993 & Supp.2000),[2] was inapplicable to the stipu-

---

1. Pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1) (2001), Miyahira has been substituted automatically as a defendant-appellee in the present action.

2. HRS § 37-37 provides in relevant part:

    (a) Except as provided in subsection (b), when the director of finance determines at any time that the probable receipts from taxes or any other sources for any appropriation will be less than was anticipated, and that consequently the amount available for the remainder of the term of the appropriation or for any allotment period will be less than the amount estimated or allotted therefor, the director shall, with the approval of the governor and after notice to the department or establishment concerned, reduce the amount allotted or to be allotted; provided that no reduction reduces any allotted amount below the amount required to meet valid obligations or commitments previously incurred against the allotted funds.

    (b) For the University of Hawaii, when the director of finance determines at any time that the probable receipts from taxes or any other sources for any appropriation will be less than was anticipated, and that consequently the amount available for the remainder of the term of the appropriation or for any allotment period will be less than the amount estimated or allotted therefor, the director shall advise the governor of the situation, and the governor shall redetermine the allotment ceiling for the affected source or sources of funding pursuant to section 37-34, and shall advise the university and make a public declaration ten days prior to the effective date of the redetermination. The university, not more than twenty days after the governor's notification, shall submit revised estimates consistent with the governor's redetermination to the director of finance. Otherwise, the director of finance shall modify, amend, or reduce any allotment of the university to comply with the governor's redetermination; provided that no reduction shall reduce any allotted amount below the

lated facts; (2) the circuit court misread HRS § 37–37; (3) the circuit court misconstrued a statement in the plaintiffs' motion for summary judgment as a "judicial admission"; and (4) the circuit court overlooked applicable legal authority cited by the plaintiffs in reaching its ultimate conclusion. Miyahira and Cayetano argue that: (1) the plaintiffs lacked standing to bring the present action; (2) the case is moot; (3) their decision to reduce the University of Hawaii's allotment of funds appropriated for it in the fiscal year 1998 was within their constitutional and statutory authority; and (4) the plaintiffs conceded in their pleadings that the reduction was legal.

We agree with Miyahira and Cayetano that the plaintiffs lack standing to assert the claims for relief at issue in this matter. Accordingly, we need not and do not reach the merits of the plaintiffs' appeal. Accordingly, we vacate the circuit court's judgment in favor of Anzai and Cayetano and against the plaintiffs and remand the case to the circuit court with instructions to enter an order dismissing the complaint for lack of jurisdic-

tion. *See Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court,* 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999).

## I. BACKGROUND

On February 23, 1998, UHPA, which is a labor union representing University of Hawai'i faculty members, and Alexander Malahoff, Linda Currivan, Diane Ferreira, Hugh Folk, Vincent Linares, and David Miller,[3] each of whom was a University of Hawai'i faculty member, [collectively the "federal plaintiffs"] filed a complaint in the United States District Court for the district of Hawai'i [hereinafter, the "federal action"] against Cayetano and Sam Callejo, in his capacity as the comptroller of the State of Hawai'i, [hereinafter, the "federal defendants"] for declaratory and injunctive relief seeking to prevent the implementation of the "payroll lag act."[4] *See University of Hawaii Professional Assembly v. Cayetano,* 183 F.3d 1096, 1100–01 (9th Cir.1999). On May 6, 1998, the federal plaintiffs filed a motion for a preliminary injunction. *See University of Hawaii Professional Assembly v. Cayeta-*

---

amount required to meet valid obligations or commitments previously incurred against the allotted funds.

**3.** Diane Ferreira and David Miller are also among the plaintiffs in the present action.

**4.** The "payroll lag act," signed into law on July 3, 1997, *see* 1997 Haw. Sess. L. Act 355, amended HRS § 78–13 (1993) to provide in relevant part:

Unless otherwise provided by law, all officers and employees shall be paid at least semimonthly except that ... the governor, upon reasonable notice and upon determination that the payroll payment basis should be converted from predicted payroll to after-the-fact payroll,[ ] may allow a one-time once a month payroll payment to all public officers and employees to effect a conversion to after-the-fact payroll as follows:

(1) The implementation of the after-the-fact payroll will commence with the June 30, 1998, pay day, which will be delayed to July 1, 1998;
(2) The July 15, 1998, pay day will be delayed to July 17, 1998;
(3) The July 31, 1998, pay day will be delayed to August 3, 1998;
(4) The August 14, 1998, pay day will be delayed to August 19, 1998;
(5) The August 31, 1998, pay day will be delayed to September 4, 1998;

(6) The September 15, 1998, pay day will be delayed to September 18, 1998; and
(7) Thereafter, pay days will be on the fifth and the twentieth of every month. If the fifth and the twentieth fall on a state holiday, Saturday, or Sunday, the pay day will be the immediately preceding weekday.

The implementation of the after-the-fact payroll shall not be subject to negotiation under [HRS] chapter 89.

The parties stipulated that the implementation of the "payroll lag act" would have resulted in a reduction in the University of Hawaii's expenditures of approximately $6,163,000.00 in the fiscal year 1998. The parties' factual stipulation further agreed that:

5. The Executive Branch of the State matched the expected reduction in [the University of Hawaii's] expenditures by a reduction in the budgetary allotment to the [University of Hawai'i] of the same amount. In other words, the amount of money released to the [University of Hawaii] would be restricted by the amount of the expected payroll lag savings. . . .

6. The State's restriction was imposed on the allotment for the fourth quarter of [fiscal year] 1998.

7. This restriction in allotment was announced on or about September 18, 1997 on a paper conveyed to the [University of Hawai'i].

*no,* 16 F.Supp.2d 1242, 1244 (D.Haw.1998). On June 16, 1998, the federal court granted the motion.[5] *Id.* at 1248. The federal defendants moved for a stay of the preliminary injunction, which was denied. *See Cayetano,* 183 F.3d at 1101.

The parties stipulated to the sequence of events that followed the issuance of the preliminary injunction as follows:

10. On June 25, 1998, following the issuance of the preliminary injunction, President [of the University of Hawai'i Kenneth] Mortimer wrote to Governor Cayetano, requesting the release to the [University of Hawai'i] of the money that had previously been restricted.

11. On or about July 9, 1998, the [University of Hawai'i] met with Governor Cayetano and Budget Director Anzai regarding how to deal with the just-expired fiscal quarter.

12. At the meeting, the [University of Hawai'i], through President Mortimer and Vice President [Eugene] Imai, asked Governor Cayetano to lift the restriction of the fourth quarter [fiscal year] 1998 allotment, since the anticipated savings from the lag had not been achieved, due to the federal injunction. [Vice President] Imai was concerned that unless the restriction were lifted, the [University of Hawai'i] would be in

essence committed to spending [approximately] 6.2 million dollars more than had been released to it, and there was a potential for violating HRS § 37–42.[6]

13. Budget Director Anzai opposed lifting the restriction, since that would have created an alteration in his financial plan, and a reduction in the State's general fund balance.

14. Furthermore, although the State revenues were somewhat above expectations, and the restricted funds could have been restored to the [University of Hawai'i] budget, Budget Director Anzai considered restoration of the [University of Hawai'i] budget undesirable, since the administration had higher priorities if restrictions were to be lifted, such as Head Start.

15. Also, Budget Director Anzai considered that the [University of Hawai'i] could encumber monies and direct them to different ends.

16. On July 14, 1998, Governor Cayetano informed President Mortimer in writing that he had decided not to restore the money that had been restricted in anticipation of the payroll lag.

17. As a result of Governor Cayetano's decision not to lift the restriction in the [University of Hawaii's] fourth quarter al-

**5.** The United States Circuit Court of Appeals for the Ninth Circuit affirmed, holding that the federal district court did not abuse its discretion in issuing the preliminary injunction, inasmuch as (1) the plaintiffs showed a likelihood of success on the merits, (2) absent a preliminary injunction, irreparable harm to the plaintiffs was likely, and (3) the balance of hardships weighed against the defendants. *Cayetano,* 183 F.3d at 1108. In its analysis, the federal appellate court noted that (1) the timing of wage payment was part of the plaintiffs' collective bargaining agreement, (2) the implementation of the "payroll lag act" would have resulted in a "substantial impairment" of the collective bargaining agreement, inasmuch as the plaintiffs relied on the timely receipt of their paychecks to pay child support obligations, mortgage payments, and insurance premiums, (3) the "payroll lag act" precluded any effective remedy for a breach of the plaintiffs' contractual rights in violation of the contract clause of the federal constitution; and (4) the defendants failed in their attempt to provide an overriding justification of their actions by demonstrating that the "payroll lag act" was reasonable and necessary to fulfill an important

public purpose in light of Hawaii's budgetary crisis. *Id.* at 1101–07.

**6.** HRS § 37–42 (1993) provides in relevant part:

No department or establishment shall expend or be allowed to expend any sum, or incur or be allowed to incur any obligation in excess of an allotment. No obligation incurred in excess of the balance of an allotment shall be binding against the State, but where the obligation is violative only for having been made in excess of an allotment, the director of finance may authorize payment thereof from unallotted funds. Any officer, employee, or member of any department or establishment, who makes or causes to be made any excessive expenditure or incurs or causes to be incurred any excessive obligation shall be deemed guilty of neglect of official duty and shall be subject to removal from office and shall be liable to the State for such sum as may have been expended or paid, and such sum, together with interest and costs, shall be recoverable in an action instituted by the attorney general.

lotment, the [University of Hawai'i] had to react to the 6.2 million dollar budgetary shortfall in that quarter.

18. The [University of Hawai'i] had "encumbered" [fiscal year] 1998 monies to pay for various charges incurred in 1998. Following Governor Cayetano's refusal to release the restriction, the [University of Hawai'i], with the encouragement of Budget Director Anzai, had to "unencumber" about 6.4 million [dollars] of [fiscal year] 1998 money, use it to pay faculty salary due on June 30, 1998, and then encumber about 6.4 million [dollars] of [fiscal year] 1999 money to pay for the unpaid [fiscal year] 1998 charges.

19. An encumbrance is a commitment of money from an appropriation to the payment of particular bills.

. . . .

23. [Vice President] Imai expected, based on a letter from Governor Cayetano and followup discussions with his staff, that there would be an emergency appropriation in [fiscal year] 1999 to cover what had become a shortage in [fiscal year] 1999, due to shifting of [fiscal year] 1998 expenses to [fiscal year] 1999.

24. The Legislature did not make an emergency appropriation to the [University of Hawai'i].

On October 26, 1998, the plaintiffs filed the present complaint for declaratory and injunctive relief in the first circuit court. The plaintiffs stated in the complaint that they sought "to restore to the University of Hawaii a sum of money which was deducted from it by [Anzai and Cayetano] in violation of state law." The plaintiffs were identified as: (1) UHPA, a labor organization and the collective bargaining agent of the faculty of the University of Hawai'i; (2) Michael Mottl, David Miller, and Diane Ferreira, who were University of Hawai'i faculty members and directors of UHPA; (3) Rod Tam, who was a member of the Hawai'i State Senate; and (4) Chris Halford, who was a member of the Hawai'i State House of Representatives.

The complaint alleged: (1) a violation of the principle of separation of powers implicit in the Hawai'i Constitution by reducing, without authority, the budgetary allocation to the University of Hawai'i below the amount legislatively appropriated; and (2) a violation of HRS ch. 37 by (a) failure to restore to the University of Hawai'i an amount sufficient to pay the faculty paychecks on June 30, 1998 when the federal injunction precluded implementation of the payroll lag, (b) causing monies encumbered in fiscal year 1998 for the purchase of supplies, services, and other purposes to be diverted to the payment of salaries, and (c) causing the University of Hawaii's budget in fiscal year 1999 to be impaired by the cost shifted from the fiscal year 1998. The complaint prayed for a declaration that Anzai and Cayetano had violated the law and for an injunction directing them "to add to the Fiscal Year 1999 [University of Hawai'i] budget an amount sufficient to offset the improper cut imposed on the Fiscal Year 1998 budget."

On April 4, 2000, the parties filed their factual stipulation. On May 15, 2000, the plaintiffs filed a motion for summary judgment, arguing that HRS ch. 37 required Anzai and Cayetano to remove the restriction of the University of Hawaii's allotment for the fourth quarter of fiscal year 1998 when the payroll lag was enjoined. They emphasized that, in order to prevent the executive branch's unfettered discretion and potential for abuse in altering legislative appropriations, the statutory provisions for the reduction of appropriated expenditures should be narrowly construed and precisely delimited. They pointed out that HRS ch. 37 affords the University of Hawai'i special autonomy in setting its own quarterly allotments, reflecting the legislature's intent to limit the executive branch's ability to alter the amounts receivable by the University of Hawai'i from its appropriations. They argued that Anzai and Cayetano had failed to obey the mandate of HRS § 37–31 (1993),[7] inasmuch as the

---

7. HRS § 37–31 provides:

**Intent and policy.** It is declared to be the policy and intent of the legislature that the total appropriations made by it, or the total of any budget approved by it, for any department or establishment, shall be deemed to be the maximum amount authorized to meet the requirements of the department or establishment

federal injunction had resulted in "changed conditions" requiring them to restore the University of Hawaii's allotment to its original level.

The plaintiffs stated in the memorandum in support of their motion for summary judgment that,

> [f]or purposes of this case, Plaintiffs do not contest the executive's 1997 reduction of the fourth quarter allotment to reflect anticipated savings from the proposed imposition of the payroll lag. Although it strikes us that such a reduction was legally rash, the [University of Hawai'i] apparently acquiesced in that reduction. The stipulations do not reveal any controversy surrounding that reduction. For that reason, we take the reduction in the [University of Hawaii's] allotment for the fourth quarter of [fiscal year] 1998 as a given, and direct the reader's attention to those matters from and after the time the payroll act was enjoined as to [the University of Hawai'i] faculty.

On May 16, 2000, Anzai and Cayetano filed a motion to dismiss the complaint or, in the alternative, for summary judgment. They argued that the complaint should be dismissed because (1) the plaintiffs lacked standing to maintain the present action, having suffered no injury as a result of the conduct of which they complained, and (2) the case was mooted by the lapse of the funds appropriated for the fiscal year 1998, pursuant to HRS §§ 37-41 (1993 & Supp. 2000) and 40-66 (1993),[8] which divested the circuit court of the authority to fashion an effective remedy benefitting the plaintiffs.

They also argued that they were entitled to summary judgment in their favor, inasmuch as their actions were within their constitutional and statutory authority, citing primarily *Board of Education v. Waihee*, 70 Haw. 253, 256–57, 768 P.2d 1279, 1281 (1989), and HRS § 37–31, *see supra* note 7.

The case was submitted to the circuit court for a summary adjudication as a matter of law under the parties' stipulation. In order to fully understand the parties' stipulation, it is useful to review some aspects of the process through which the state's executive departments are funded. The University of Hawai'i, being one of the "principal departments" within the structure of the executive branch of the state government "[u]nder the supervision of the governor," HRS § 26–4 (1993 & Supp.2000), is generally subject to these procedures. However, the relevant statutes contain certain special provisions pertaining specifically to the University of Hawai'i.

The Governor, in whom "[t]he executive power of the State [is] vested," is responsible under the State Constitution "for the faithful execution of the laws." Hawaii State Constitution (Haw. Const.) art. V, §§ 1 and 5. He is responsible too for the submission "to the legislature [prior to the opening of each regular session in an odd-numbered year of] a budget in a form provided by law setting forth a complete plan of proposed expenditures of the executive branch[.]" Haw. Const. art VII, § 8. "[U]pon the opening of each such session, [he] submit[s] bills to provide for such proposed expenditures[,]" *id.*, and the leg-

---

for the period of the appropriation, excepting as may otherwise be provided by law, and that the governor and the director of finance should be given the powers granted by sections 37–32 to 37–41 in order that savings may be effected by careful supervision throughout each appropriation period with due regard to changing conditions; and by promoting more economic and efficient management of state departments and establishments.

8. HRS § 37–41 provides:

Unless otherwise provided by section 37–41.5 or any other law, every appropriation or part thereof of any kind made subject to sections 37–31 to 37–40, remaining unexpended and unencumbered at the close of any fiscal year shall lapse and be returned to the general

fund in the manner prescribed in section 40–66.

HRS § 40–66 provides:

Unless otherwise provided by law all sums of money which are appropriated to the public service for any fiscal period, and which are not expended during the period, shall lapse, and shall not be issued or applied in any future fiscal period to the particular service for which the appropriation has been so made, unless a contract of engagement has been made and entered into before the expiration of the fiscal period by which a liability so to issue or apply the same has been incurred, and a certified copy of which contract or engagement has been deposited with the comptroller.

islature enacts "an appropriation bill or bills providing for the anticipated total expenditures of the State for the ensuing fiscal biennium." *Id.*, § 9. Since general fund expenditures exceeding the State's current general fund revenues and unencumbered cash balances are interdicted by the State Constitution, it also mandates that "[p]rovision for the control of the rate of expenditures of appropriated state moneys, and for the reduction of such expenditures under prescribed conditions, shall be made by law." Haw. Const. art. VII, § 5.

The Governor exercises control over the executive budget through the Department of Budget and Finance, which is headed by the Director of Finance. Pursuant to Hawaii Revised Statutes (HRS) § 26–8, the [Department of Budget and Finance] is charged with "the preparation and execution of the executive budget of the state government;" it is also directed thereunder to "conduct a systematic and continuous review of the finances, organization, and methods of each department of the State to assist each department in achieving the most effective expenditure of … public funds and to determine that such expenditures are in accordance with the budget laws and controls in force[.]"

*Board of Education,* 70 Haw. at 256–57, 768 P.2d at 1281 (ellipsis points in original) (some brackets added and some in original).

Subject to certain exceptions not pertinent to the present matter, the funds appropriated by the legislature pursuant to an appropriation bill or bills are disbursed to the executive departments "pursuant to the allotment system provided for in [HRS] sections 37–31 to 37–41." HRS § 37–32 (1993 & Supp.2000). "For the purposes of the allotment system, each fiscal year [is] divided into four quarterly allotment periods, beginning, respectively, on the first days of July, October, January, and April[.]" *Id.* "Allotments [are] made according to the classifications of expenditures prescribed in the appropriation measure as enacted by the legislature[.]" HRS § 37–38 (1993). "No department [is] allowed to expend any sum, or incur … any obligation in excess of an allotment." HRS § 37–42 (1993). Each department is re-

quired to submit to the director of finance "an estimate … of the amount required to carry on the work of the department during [each allotment] period." HRS § 37–34(a) (1993 & Supp.2000). The estimate is subject to approval, increase, or decrease by the director. *Id.* However, for the University of Hawai'i, HRS 37–34(b) (Supp.2000) prescribes an additional procedure:

> Before appropriations for the University of Hawaii become available to the university, the university shall advise the governor and the director of finance of the amount necessary for payments for financing agreements under chapter 37D, [and] the governor, with the assistance of the director of finance, as may be necessary, shall establish allotment ceilings for each source of funding of all of the appropriations of the University of Hawaii for each allotment period and shall advise the university of these determinations.

The final determination of the allotments for each of the departments is made by the director of finance pursuant to HRS § 37–35 (Supp.2000):

> The director of finance shall review all estimates submitted under section 37–34 [ (a) ] and, having due regard for:
>
> (1) The probable further needs of the department or establishment for the remainder of the term for which the appropriation was made;
>
> (2) The terms and purposes of the appropriation, the progress of collection of revenues, and condition of the treasury; and
>
> (3) The probable receipts and total cash requirements for the ensuing quarter, shall approve, increase, or reduce the amount of the estimate;
>
> provided that the director of finance shall approve the estimates submitted by the University of Hawaii when:
>
> (1) The sum of the estimates for each funding source does not exceed the applicable allotment ceilings established by the governor under section 37–34 [ (b) ];
>
> (2) The progress of collection of revenues, the condition of the treasury,

and the probable receipts and total cash requirements for the ensuing quarter permit; and

(3) All other legal requirements are satisfied.

The director shall act promptly upon all estimates and notify each department or establishment of its allotment, and shall notify the comptroller.

The allotments thus made are subject to subsequent reduction pursuant to HRS § 37–37, *see supra* note 2, or modification pursuant to HRS § 37–36 (Supp.2000).[9]

The circuit court heard the parties' cross-motions on June 8, 2000 and, on the following day, filed an order granting Anzai and Cayetano's motion for summary judgment and denying the plaintiffs' motion for summary judgment. In its order, the circuit court concluded that HRS § 37–37 applied to the present matter. However, apparently misreading the statute, it stated that,

under [HRS § 37–37], reductions of future allotments for the University of Hawaii, as governed by subsection (b), does not contain the condition applicable to other executive departments under subsection (a) that "no reduction reduce[ ] any allotted amount below the amount required to meet valid obligations or commitments previously incurred against the allotted funds."

It based its decision in part on this reading of the statute, but also on the plaintiffs' alleged "judicial admission" that the 1997 restriction of the University of Hawaii's fourth quarter allotment was legal. It expressly rejected the plaintiffs' argument that the federal court's injunction against the imposition of the payroll lag obligated the executive to comply with the university's request to lift the restriction. On June 26, 2000,

pursuant to its summary judgment order, the circuit court filed a final judgment in favor of Anzai and Cayetano and against the plaintiffs. This appeal followed.

## II.  STANDARD OF REVIEW

■■■ "We review a circuit court's grant or denial of summary judgment *de novo* under the same standard applied by the circuit court." *Dairy Road Partners v. Island Ins. Co., Ltd.,* 92 Hawai'i 398, 411, 992 P.2d 93, 106 (2000) (citations and brackets omitted). Whether the circuit court had jurisdiction to hear the plaintiffs' complaint presents a question of law, reviewable *de novo. See, e.g., Carl Corp. v. Department of Education,* 93 Hawai'i 155, 171, 997 P.2d 567, 583 (2000) (citing *Lester v. Rapp,* 85 Hawai'i 238, 241, 942 P.2d 502, 505 (1997)). A plaintiff without standing is not entitled to invoke a court's jurisdiction. *See Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court,* 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999) (citing *Matson Navigation Co. v. Federal Deposit Ins. Corp.,* 81 Hawai'i 270, 275, 916 P.2d 680, 685 (1996)); *see also Public Access Shoreline Hawaii v. Hawai'i County Planning Comm'n,* 79 Hawai'i 425, 434, 903 P.2d 1246, 1255 (1995) (reviewing *de novo* whether party had standing to participate in agency proceeding). Thus, the issue of standing is reviewed *de novo* on appeal. *Cf. Norris v. Hawaiian Airlines, Inc.,* 74 Haw. 235, 239, 842 P.2d 634, 637 (1992) ("A trial court's dismissal for lack of subject matter jurisdiction is a question of law, reviewable *de novo.*").

## III.  DISCUSSION

■■■ "Standing is concerned with whether the parties have the right to bring suit." *Pele Defense Fund v. Puna Geo-*

---

9.  HRS § 37–36 provides in relevant part:

(a) The director of finance may modify or amend any previous allotment upon notice to the department or establishment concerned; provided that:

(1) For the University of Hawaii, the director of finance may modify or amend any previous allotment only upon application of or notice to the university, and upon public declaration, which shall be made ten days prior to the modification or amendment taking effect;

(2) The modification or amendment shall be made only to avoid an illegal result or in anticipation of a revenue shortfall;

(3) No deficit or undue reduction of funds to meet future needs of the department or establishment will result from the modification or amendment; and

(4) No modification or amendment shall reduce an allotment below the amount required to meet valid obligations or commitments previously incurred against the allotted funds.

*thermal Venture,* 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994).

. . . .

"It is well settled that the crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his or her behalf." *In re Application of Matson Navigation Co. v. Federal Deposit Ins. Corp.,* 81 Hawai'i 270, 275, 916 P.2d 680, 685 (1996). In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, we employ a three-part test: (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury. *Bush v. Watson,* 81 Hawai'i 474, 479, 918 P.2d 1130, 1135 (1996).

With respect to the first prong of this test, the plaintiff "must show a distinct and palpable injury to himself [or herself.]" *Life of the Land v. Land Use Commission of State of Hawai'i,* 63 Haw. 166, 173 n. 6, 623 P.2d 431, 446 n. 6 (1981). The injury must be "distinct and palpable, as opposed to abstract, conjectural, or merely hypothetical." *Doyle v. Oklahoma Bar Ass'n,* 998 F.2d 1559, 1566 (10th Cir.1993) (citations omitted).

*Akinaka,* 91 Hawai'i at 55, 979 P.2d 1077 (brackets in original).

On the other hand, for the purposes of establishing standing in an action for declaratory relief, HRS § 632–1 [10] interposes less stringent requirements for access and participation in the court process. As this court explained in *Richard v. Metcalf,*

---

**10.** HRS § 632–1 (1993) provides in relevant part:

Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation,

---

82 Hawai'i 249, 254 n. 12, 921 P.2d 169, 174 n. 12 (1996),

[a]lthough HRS § 632–1 provides for standing to sue "[i]n cases of actual controversy," HRS § 632–6 [ (1993) ] clarifies that

[the] purpose [of HRS chapter 632] is to afford relief . . . without requiring one of the parties interested so to invade the rights asserted by the other as to entitle the party to maintain an ordinary action therefor. It is to be liberally interpreted and administered, with a view to making the courts more serviceable to the people.

*Id.* (citing *Life of the Land,* 63 Haw. at 172, 623 P.2d at 438).

. . . In *Life of the Land v. Land Use Commission,* 63 Haw. 166, 623 P.2d 431 (1981), this court held that Life of the Land, an environmental organization, and its members, who were neither owners of reclassified land nor owners of land adjoining reclassified land, had standing to invoke judicial scrutiny of LUC procedures, as well as its determinations, by way of declaratory action. *Id.* at 169, 623 P.2d at 436.

Indicating that the personal or special interests or "rights" advanced by Life of the Land were subject to judicial protection, we held that the criteria prescribed by HRS §§ 91–7 and 632–1 "present[ed] no barriers to adjudication." *Id.* at 177, 623 P.2d at 441. In so holding, we explained that, although standing principles are governed by "prudential rules" of judicial self-governance, standing requisites "may also be tempered, or even prescribed, by legislative and constitutional declarations of policy." *Id.* at 172, 623 P.2d at 438 (footnote omitted). Indeed, we emphasized that the touchstone of this court's

---

status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.

notion of standing is 'the needs of justice.'"*Id.* at 176, 623 P.2d at 441.

*Citizens for Protection of North Kohala Coastline v. County of Hawai'i*, 91 Hawai'i 94, 100, 979 P.2d 1120, 1126 (1999) (footnote omitted) (some brackets and ellipsis points added and some in original) (holding that plaintiffs "alleged injury in fact sufficient to constitute standing to participate in a declaratory judgment action").

Miyahira and Cayetano argue that standing to bring the present action resided in the University of Hawaii, through its board of regents,[11] rather than in the plaintiffs. However, they cite no relevant authority for the proposition that the University of Hawai'i had the exclusive right to complain of Anzai's and Cayetano's actions.[12]

■ We addressed a similar argument in *Akau v. Olohana Corp.*, 65 Haw. 383, 652 P.2d 1130 (1982). Akau and several others brought a class action to enforce alleged rights-of-way along once public trails to the beach that crossed some of the defendants' property. *Id.* at 384, 652 P.2d at 1132. The *Akau* court analyzed the appealing defendant's argument that the plaintiffs did not have standing as follows:

> Defendant argues that only the State may bring an action against landowners to enforce the public's right of beach access. This proposition can be traced to the general rule in the law of public nuisance that a private individual has no standing to sue for the abatement of a public nuisance if his injury is only that which is shared by the public generally. . . .
>
> This rule developed in the early common law because harm to the public order, de-

cency or morals was considered a crime against the king. *See* Prosser, *Private Action for Public Nuisance*, 52 Va. L.R. 997 (1966). Only the king, therefore, could bring an action against the perpetrator. The sole exception to this rule was that a member of the public had standing to sue if he suffered a special injury that was different in kind, and not merely in degree, from the general public. The purpose of the rule is to prevent a multiplicity of actions and frivolous suits.

There is a trend in the law, however, away from focusing on whether the injury is shared by the public, to whether the plaintiff was in fact injured. This trend began, not in nuisance, but in taxpayer suits. The general rule had been that a plaintiff had no standing to challenge an improper government act based solely on his status as a taxpayer. *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). In these actions, like nuisance, the harm was considered to be to the public generally and no one suffered any direct harm to himself. In *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Court rejected the special injury requirement where the harm was that Congress had violated a specific constitutional limitation on its spending power. Many states have since greatly liberalized taxpayer standing beyond the federal rule and allow taxpayer suits against any improper expenditure of public funds without need to show special injury to the plaintiff. This court has allowed standing for taxpayers who allege an unconstitutional expenditure of public

---

11. Pursuant to article X, section 5 of the Hawai'i Constitution, the University of Hawai'i is headed by a board of regents, which is appointed by the governor with the advice and consent of the senate. *See also* HRS § 26–11 (1993 & Supp. 2000).

12. In *Board of Education*, which Miyahira and Cayetano cite, the plaintiffs, who had challenged the actions of the governor and the director of finance in connection with their preparation of the state's education budget, were the Board of Education of the State of Hawai'i, some of its members suing individually, and the Hawai'i State Teachers Association (HSTA). The defen-

dants in *Board of Education* sought dismissal of the complaint on the grounds, *inter alia*, that the plaintiffs lacked standing and that the case was moot. 70 Haw. at 258, 768 P.2d at 1282. The circuit court dismissed the complaint on the ground that it involved political questions inappropriate for judicial resolution. *Id.* at 259, 768 P.2d at 1283. In reversing the circuit court's decision, this court did not address the issues of standing and mootness, although it remarked that "[t]hough we have doubts that the [HSTA] has standing, we do not find it necessary to discuss this question." *Id.* at 253 n. 1, 768 P.2d at 1281 n. 1.

funds.[13] *Bulgo v. County of Maui,* 50 Haw. 51, 430 P.2d 321 (1967); *Castle v. Secretary of the Territory,* 16 Haw. 769 (1905).

The courts have also broadened standing in actions challenging administrative decisions. The U.S. Supreme Court has granted standing where plaintiffs allege environmental harm even though plaintiffs' harm is equally shared by a large segment of the public. *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). In *In re Hawaiian Electric Co.,* 56 Haw. 260, 535 P.2d 1102 (1975) we granted standing to utility users who challenged a Public Utility Commission's approval of rate increases, although plaintiffs shared the additional rate with all other users. We have also broadly construed standing in other administrative law cases. *See Life of the Land v. Land Use Commission,* 63 Haw. 166, 623 P.2d 431 (1981); *Waianae Model Neighborhood Area Association, Inc. v. City and County of Honolulu,* 55 Haw. 40, 514 P.2d 861 (1973).

Claims of harm to public trust property is another area where courts are expanding standing. . . .

This court has been in step with the trend away from the special injury rule towards the view that a plaintiff, if injured, has standing. . . .

We concur in this trend because we believe it is unjust to deny members of the public the ability to enforce the public's rights when they are injured. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison,* 5 U.S. 137, 163, 2 L.Ed. 60 (1803).

*Id.* at 386–88, 652 P.2d at 1133–34 (footnotes and some citations omitted).

Accordingly, the standing inquiry in the present matter must focus on whether the plaintiffs have suffered an "injury in fact," which requires a showing that: (1) they have suffered an actual or threatened injury as a result of the defendants' conduct; (2) the injury is traceable to the challenged action; and (3) the injury is likely to be remedied by a favorable judicial decision. *Id.* at 389, 652 P.2d at 1134–35.

The plaintiffs cite *Akau* for the proposition "that a member of the public has standing to sue to enforce the rights of the public even though his injury is not different in kind from the public's generally, if he can show that he has suffered an injury in fact, and that the concerns of a multiplicity of suits are satisfied by any means, including a class action." *Id.* at 388–89, 652 P.2d at 1134. They insist that the gravamen of their suit, in the abstract, is to enforce the right of the public to see that the funds appropriated by their legislature are in fact released to the public agencies for which the funds were intended without undue interference from the executive branch. By asserting that they seek to ensure that the executive branch disburses legislatively appropriated funds to their intended recipients in accordance with the law, the plaintiffs are "seek[ing] to do no more than vindicate [their] own value preferences through the judicial process." *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 283, 768 P.2d 1293, 1299 (1989) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 1369, 31 L.Ed.2d 636

13. In *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 768 P.2d 1293 (1989), we clarified that "[t]wo requirements ... must be met for taxpayer standing: (1) plaintiff must be a taxpayer who contributes to the particular fund from which the illegal expenditures are allegedly made; and (2) plaintiff must suffer a pecuniary loss [by the increase of the burden of taxation], which, in cases of fraud, are presumed." *Id.* at 282, 768 P.2d at 1298. In *Iuli v. Fasi,* 62 Haw. 180, 613 P.2d 653 (1980), this court noted that injury to taxpayers may be also be presumed under some special circumstances, citing *Bulgo v. County of Maui,* 50 Haw. 51, 430 P.2d 321 (1967) (alleged illegal expenditure of funds in conducting elections under invalid statutory provision), and *Federal Electric Corp. v. Fasi,* 56 Haw. 57, 527 P.2d 1284 (1974) (patently improper and defective public contract bidding procedures). The individual plaintiffs in the present matter alleged in their complaint that they were taxpayers, but they did not expressly claim general taxpayer standing, let alone any recognized "special circumstances." Insofar as they have not alleged that they suffered any pecuniary loss as a result of Anzai's and Cayetano's actions, the circuit court's exercise of jurisdiction over their complaint may not be justified on the ground that they were taxpayers.

(1972)) (brackets in original). The *Hawaii's Thousand Friends* court explained:

> In *Sierra Club v. Morton, supra,* the United States Supreme Court did not doubt Sierra Club's genuine interest in the issue presented in the lawsuit. But unless it could show some concrete injury, Sierra Club was merely asserting a "value preference" and not a legal right. The proper forum for the vindication of a value preference is in the legislature, the executive, or administrative agencies, and not the judiciary. For it is in the political arena that the various interests compete for legal recognition.
>
> . . . .
>
> In *Sierra Club v. Morton,* the Supreme Court explained why a special interest in the problem, by itself, would not be sufficient to confer standing.
>
> > [I]f a "special interest" in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide "special interest" organization, however small or short-lived. And if any group with a bona fide "special interest" could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.
>
> *Sierra Club v. Morton,* 405 U.S. at 739–40, 92 S.Ct. at 1368.
>
> . . . . We abhor the use of courtrooms as political forums to vindicate individual value preferences.

*Id.* at 283–84, 768 P.2d at 1299.

■ Most of them being tenured faculty members at the University of Hawai'i whose careers may span thirty or more years, the plaintiffs point out that they have a special vested interest in the fiscal condition of the university. In and of itself, the foregoing merely establishes their "special interest" in the subject of this lawsuit. *Id.* Similarly, the plaintiffs assert that Tam and Halford, who are members of the legislature, "have not only the interest of a general member of the public in seeing that the laws of the state are complied with, but the interest of persons who have spent their own official time on behalf of their constituents, reviewing, voting on, and enacting budgets that become law." This establishes Tam's and Halford's "special interest" but not an "injury in fact." They have not alleged any "personal stake in the outcome of the controversy," inasmuch as they have not alleged that they had personally suffered any "distinct and palpable injury." *Akinaka,* 91 Hawai'i at 55, 979 P.2d 1077. Because a "special interest" in the subject matter of a lawsuit is insufficient to invoke judicial intervention, Tam and Halford are without standing in this action.

■ With respect to the standing of the University of Hawai'i faculty members, the plaintiffs allege that the six million dollars withheld from the funds intended for the university resulted in "a loss of support for working conditions, teaching programs, research programs, discretionary support staff, replacement of consumable items, and . . . electricity and telephone charges." Citing *Pele Defense Fund,* they attempt to characterize the alleged "injuries to faculty working conditions" as "generalized" injuries in the sense that these injuries are "spread" among the faculty members and that relief granted to a representative organization of members would provide a remedy to individual members.

The concept of "generalized" injury was introduced in *Pele Defense Fund* to distinguish such injuries from the sort of "personalized" injuries at issue in *Hawaii's Thousand Friends. Pele Defense Fund v. Paty,* 73 Haw. 578, 593–94, 837 P.2d 1247, 1258. Hawaii's Thousand Friends lacked standing to bring claims on behalf of its members, who were allegedly misled by advertisements run by the defendants, inasmuch as each member would have relied differently on the alleged misrepresentation and would have suffered different injuries, necessitating different remedies. *Hawaii's Thousand Friends,* 70 Haw. at 284–85, 768 P.2d at 1300. The *Pele Defense Fund* court distinguished the situation in *Hawaii's Thousand Friends* from the case of the plaintiffs who sought an injunction remedying the state's alleged breach of its obligations as the trustee of the public

trust created by section 5(f) of the Admission Act. *Pele Defense Fund*, 73 Haw. at 593–94, 837 P.2d at 1258. "In this case, the alleged § 5(f) violations are 'generalized' injuries for which relief granted to the organization would provide a remedy to any individual member. In other words, [Pele Defense Fund's] members and other trust beneficiaries would benefit indistinguishably." *Id.*

To the extent that the working conditions of the University of Hawai'i faculty were impaired as a result of the defendants' actions, such an injury may be "generalized" in the sense that it equally affected all faculty members. However, regardless of whether the alleged injury is characterized as "generalized" or "personal," the threshold issue remains whether the plaintiffs have, *in fact*, suffered a deterioration in their working conditions or any other detriment, actual or threatened, as a result of the defendants' actions. The circuit court did not address the issue whether the alleged injuries were "generalized" or "personal," but a determination of that issue would have merely borne on UHPA's standing as an organization representing the faculty members and, therefore, would not have been dispositive of the issue in the present matter, in which both individual faculty members and their organization are the plaintiffs.[14] *Cf. id.*

The plaintiffs further point out that, in *Pele Defense Fund*, "[t]his court has adopted a broad view of what constitutes a 'personal stake' in cases in which the rights of the public might otherwise be denied hearing in a judicial forum" and that this court "lower[ed] standing barriers in cases of public interest." *Id.* In full, the relevant language in *Pele Defense Fund*, upon which the plaintiffs rely, is as follows:

We hold that [Pele Defense Fund] has standing to bring its claims in Hawaii courts, consistent with this court's decisions lowering standing barriers in cases of public interest. *See, e.g., In re Banning*, 73 Haw. 297, 312–13, 832 P.2d 724, 732–33 (1992); *Akau v. Olohana Corp.*, 65 Haw. 383, 652 P.2d 1130 (1982); *Life of the Land v. Land Use Comm'n*, 63 Haw. 166, 623 P.2d 431 (1981); *In re Applic. of Haw'n Elec. Co., Inc.*, 56 Haw. 260, 535 P.2d 1102 (1975). Regardless of the standing theory, "the crucial inquiry . . . is 'whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of . . . [the court's] jurisdiction and to justify exercise of the court's remedial powers on his behalf.' " *Hawaii's Thousand Friends v. Anderson*, 70 Haw. 276, 281, 768 P.2d 1293, 1298 (1989) (citations omitted). This court has adopted a broad view of what constitutes a "personal stake" in cases in which the rights of the public might otherwise be denied hearing in a judicial forum. *Id.* at 283, 768 P.2d at 1299; *see also Akau*, 65 Haw. at 387–88, 652 P.2d at 1134.

*Id.* (ellipsis points in original). Accordingly, the *Pele Defense Fund* court reiterated the "injury in fact" standard set forth in *Akau* and held that the plaintiff's allegations in that case satisfied the three conditions of the *Akau* test. *Id.* Only after making that threshold determination did the *Pele Defense Fund* court address the remaining issues posed by the points of error on appeal.

To date, the appellate courts of this state have generally recognized public interest concerns that warrant the lowering of standing barriers in two types of cases: those pertaining to environmental concerns and those pertaining to native Hawaiian rights.[15]

---

14. Anzai and Cayetano argued in the circuit court that, as a labor organization within the meaning of HRS ch. 89, UHPA had legislatively prescribed functions, primarily consisting of negotiating and enforcing its members' collective bargaining agreement, and that, therefore, it was not authorized to pursue the present action, which does not involve a collective bargaining agreement.

15. In *State ex rel. Bronster v. Yoshina*, 84 Hawai'i 179, 932 P.2d 316 (1997), this court relied on the fact that the case involved an issue of "significant

public importance . . . which [wa]s likely, if not certain, to recur, [in] hold[ing] that the attorney general ha[d] standing to raise the claims in this action." *Id.* at 185, 932 P.2d at 322. The issue in *Yoshina* was whether the legislature had acted unconstitutionally in submitting certain proposed constitutional amendments to the voters without proper notice to the governor. The *Yoshina* court held, *inter alia*, that the constitutional provision regarding notice were designed to benefit the governor's office, whom the attorney general was representing. Thus, *Yoshina* is inapposite in

*See generally Ka Pa'akai O Ka'aina v. Land Use Comm'n,* 94 Hawai'i 31, 42–43, 7 P.3d 1068, 1079–80 (2000); *County of Hawai'i, Dept. of Finance v. Civil Service Comm'n of County of Hawai'i,* 77 Hawai'i 396, 402 n. 5, 885 P.2d 1137, 1143 n. 5 (App.1994).

The plaintiffs attempt to analogize their situation to that of the plaintiffs in the actions raising environmental concerns, in which we have held that an injury to aesthetic, recreational, or conservational interests was sufficient to confer standing. *See, e.g., Ka Pa'akai O Ka'aina,* 94 Hawai'i at 42–44, 7 P.3d at 1079–81 (organization seeking to prevent development of parcel of land had standing to seek judicial review of land use commission's decision when members alleged development would impair their use and enjoyment by affecting pristine nature, scenic views, and open coastline of area); *Citizens for Protection of North Kohala Coastline,* 91 Hawai'i at 100–02, 979 P.2d at 1126–28 (in action for declaratory and injunctive relief to prevent construction of coastline resort, plaintiff group of citizens asserted personal and special interests sufficient to invoke court's jurisdiction by contending that they resided in close proximity to proposed project, were frequent users of area for picnics, swimming, boating, fishing; and spiritual activities, and proposed project threatened injury to plaintiffs' quality of life through irreversible changes to coastline and degradation of marine environment); *Pele Defense Fund,* 77 Hawai'i at 70, 881 P.2d at 1216 (non-profit organizations and individuals seeking judicial review of agency's decision granting partnership's request for permit for geothermal wells and power plant satisfied requirements of "injury in fact" test by alleging permits would expose them "to potential harm including diminished property values, deterioration of air quality, odor nuisance, and possible physical injury resulting from the permitted operations."). In this connection, the plaintiffs submit that if an unquantified deterioration of air quality and odor nuisance are sufficient to confer standing in such cases, then the injury resulting from the loss of the quantifiable sum of six million dollars should also be sufficient. Their argument suggests that the interest at issue is an interest in preserving the quality of their work environment, akin to the interest in preserving the "quality of life" recognized by this court in the environmental cases cited *supra.* This argument ignores the fact that, although difficult to quantify, deterioration of air quality and odor nuisance are "distinct and palpable" injuries. *Akinaka,* 91 Hawai'i at 55, 979 P.2d 1081. A court may take judicial notice of the fact of people's breathing and olfaction, and, therefore, of the fact that air quality affects the quality of people's lives. As mentioned *supra,* the quantum of interest affected is not dispositive in determining standing, especially when the public interest is at issue. It is sufficient that a cognizable injury is unambiguously demonstrated.[16] *See Akau,* 65 Haw. at 389–90, 652 P.2d at 1135.

On the other hand, the plaintiffs' allegation that the withholding of six million dollars from the University of Hawaii's appropriation resulted in "a loss of support for working conditions, teaching programs, research programs, discretionary support staff, replacement of consumable items, and . . . electricity and telephone charges" merely invites this court to infer that the plaintiffs, or at

the present context, which involves standing of the members of the general public in an action against the government. Although the legislature may confer a right to seek judicial review of a governmental action upon the members of the public as "private attorneys general," the plaintiffs do not claim that they have standing to bring the present suit in such a capacity. *See generally Hawaii's Thousand Friends,* 70 Haw. at 285, 768 P.2d at 1300.

16. The plaintiffs argued in the circuit court that this court's decision in *Chun v. Board of Trustees of Employees' Retirement System of State of Hawaii,* 92 Hawai'i 432, 992 P.2d 127 (2000), supports their claim of standing. In *Chun,* an "ad-

ministrative burden" of deducting attorneys' fees from the sums disbursed to the beneficiaries of the Employees' Retirement System (ERS) was held to be sufficient to establish standing of the Board of the ERS to challenge the award of attorney's fees. The plaintiffs argued that the expense associated with the apportionment of the deductions in *Chun* was insignificant compared with the loss of six million dollars in the present matter. However, *Chun* is inapposite, inasmuch as the severity of any injury suffered by the plaintiffs in the present matter is not at issue. The issue is whether they have suffered a cognizable injury at all.

least some of them, were actually affected. In fact, during oral argument, the plaintiffs' counsel conceded that the plaintiffs' claim to standing in the present matter depends on such an inference. However, in the absence of evidence in the record establishing what "specific" and "personal" interest has been affected, the plaintiffs' argument amounts to speculation.

Moreover, even if the plaintiffs were to have alleged specific examples of changes in their work environment that had negatively impacted them, they would still have the burden of demonstrating that these changes were attributable to the defendants' actions. The loss of six million dollars could have been offset by the university through a tuition increase, a reduction in student services, a freeze of administrative—as opposed to teaching—staff salaries, or other savings without any discernible effect on the faculty members.

The plaintiffs do not attempt to prove any specific and personal injury but, rather, press their general proposition that, in any organization, a loss of six million dollars from its budget must have *some* negative effect on its operations, ultimately affecting all of its employees. Their argument calls for assumptions or inferences that are not supported by the record or any case law that the plaintiffs cite. Accordingly, the injury that the plaintiffs assert is "abstract, conjectural, or merely hypothetical." *Akinaka*, 91 Hawai'i at 55, 979 P.2d at 1081. *Citizens for Protection of North Kohala Coastline*, 91 Hawai'i at 100, 979 P.2d at 1126, does not abrogate the "injury in fact" standing requirement in actions for declaratory relief affecting a public interest, but merely mandates less demanding standards in assessing the plaintiffs' proof of an "injury in fact." Inasmuch as the plaintiffs have failed to demonstrate that they suffered an injury to a recognized interest, as opposed to "merely airing a political or intellectual grievance," *Akau*, 65 Haw. at 390, 652 P.2d at 1135, we hold that the plaintiffs lacked standing to pursue the present action.

## IV.  CONCLUSION

Based on the foregoing analysis, we vacate the circuit court's judgment in favor of the defendants and against the plaintiffs and remand the case to the circuit court with instructions to enter an order dismissing the complaint for lack of jurisdiction.

Concurring Opinion of ACOBA, J., with whom RAMIL, J., joins.

I concur in the result announced by the majority but on the ground that "prudential considerations" militate against recognizing Appellants' standing.

## I.

In *Board of Education v. Waihee*, 70 Haw. 253, 768 P.2d 1279 (1989), the Board of Education (BOE) and the Hawai'i State Teachers Association (HSTA) filed a suit for declaratory and injunctive relief against the then-Governor and Director of the Department of Budget and Finance, contending, *inter alia*, that in violation of Hawai'i Revised Statutes (HRS) §§ 37–36 and 37–37(b), "the Governor interfered with 'the [BOE]'s implementation of the budget passed by the legislature by . . . imposing arbitrary and capricious spending restrictions' . . . 'after the budget was approved by both the legislature and the governor[.]' " *Id.* at 258, 768 P.2d at 1282 (brackets omitted). This court recognized that "the structure of government ordained by the legislature makes the [Department of Education (DOE) ] one of the eighteen principal [executive branch] departments [1 and] . . . '[u]nder policies established by the [BOE], the superintendent of education administers programs of education and public instruction throughout the State.' " *Id.* at 265, 768 P.2d at 1286 (quoting HRS § 26–12) (brackets omitted). In a vein somewhat similar to the lawsuit before us, there "the plaintiffs alleged the Governor interfered with the Board's implementation of the budget approved by the legislature when he imposed a one per cent spending restriction on the DOE. The Governor, the plaintiffs maintain[ed], may impose such restrictions only if sufficient funds are not available." *Id.* at

---

1. The University of Hawai'i was one of the eigh-

teen departments. *See* HRS § 26–4 (Supp.2000).

268, 768 P.2d at 1288. In *Waihee,* no question arose as to the standing of the BOE to bring suit. However, as to the HSTA, this court noted its "doubts" as to HSTA's standing to bring the suit, observing that "[t]he defendants challenge HSTA's standing to sue[, and *alt]hough we have doubts that the association has standing,* we do not find it necessary to discuss this question." *Id.* at 256 n. 1, 768 P.2d at 1281 n. 1 (emphasis added).

This case again raises the question of whether parties such as the University of Hawai'i Professional Assembly and, relatedly, any of the other Appellants would have standing to assert claims of an executive department as against the Appellees governor and the finance director. The BOE stands in a position to the DOE similar to that occupied by the Board of Regents (the Board) with respect to the University of Hawai'i. The BOE is vested under our constitution with "the power, as provided by law, to formulate policy and to exercise control over the public school system," Haw. Const. art. X, § 3, and "jurisdiction over the internal organization and management of the public school system, as provided by law." *Id.* The Board is constitutionally delegated "the power, as provided by law, to formulate policy, and to exercise control over the university," Haw. Const. art. X, § 6, and has "exclusive jurisdiction over the internal organization and management of the university." *Id.* Thus, the holding in *Waihee* suggests that the Board would have "standing" to seek declaratory relief on behalf of the University of Hawai'i, under similar provisions in HRS §§ 37–36 (Supp.2000) and 37–37 (Supp.2000).

## II.

In the context of "standing" doctrine, the *Waihee* case must be read as having implicitly applied the actual injury test. With respect to standing, this court has recognized that "the courts of Hawaii are not subject to

a 'cases or controversies' limitation [on their jurisdiction] like that imposed upon the federal judiciary by [a]rticle III, § 2 of the United States Constitution," *Life of the Land v. Land Use Comm'n,* 63 Haw. 166, 171, 623 P.2d 431, 438 (1981), but "nevertheless believe[s] judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context." *Id.* at 171–72, 623 P.2d at 438 (citation omitted). Additionally, " 'prudential rules' of judicial self-governance 'founded in concern about the proper—and properly limited—role of courts in a democratic society' are always of relevant concern." *Id.* (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). "Without ... judicial self-governance the courts would be called upon to decide abstract questions[.]" *Warth,* 422 U.S. at 500, 95 S.Ct. 2197. *See also Fujimoto v. Au,* 95 Hawai'i 116, 138, 19 P.3d 699, 721 (stating that " 'standing ... consist[s] of two related components: the constitutional requirements of [a]rticle III and nonconstitutional prudential considerations' ") (quoting *Franchise Tax Bd. of California v. Alcan Aluminium Ltd.,* 493 U.S. 331, 335, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990)) (citation omitted), *reconsideration denied,* 95 Hawai'i 116, 19 P.3d 699 (2001).

Our analogue of "article III" jurisdictional requirements is the three-part injury test.[2] As the record evinces and as was evident in oral argument, Appellants failed to satisfy "[t]he three-part jurisdictional limits test." *Id.* at 136, 19 P.3d at 721.

## III.

I believe that prudential considerations weigh heavily in sustaining summary judgment in this case. This court has "acknowledged that a party's standing to litigate a case may be subject to 'prudential rules' of

---

**2.** The test is stated as follows:
In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, we employ a three-part test: (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) is the injury fairly traceable to the defendant's

actions; and (3) would a favorable decision likely provide relief for plaintiff's injury.
*Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court,* 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999) (citation omitted).
*Fujimoto,* 95 Hawai'i at 136, 19 P.3d at 721.

judicial self-governance, as well as 'legislative and constitutional declarations of policy.' " *Id.* (quoting *Citizens for Protection of North Kohala Coastline v. County of Hawai'i,* 91 Hawai'i 94, 100, 979 P.2d 1120, 1126 (1999)). In discussing such prudential considerations, the United States Supreme Court has observed, *inter alia,* that "the plaintiff generally must assert his [or her] own legal rights and interests, and cannot rest his [or her] claim to relief on the legal rights or interests of third parties." *Warth,* 422 U.S. at 499, 95 S.Ct. 2197 (citations omitted). In this regard, "the source of the plaintiff's claim to relief assumes critical importance[.]" *Id.* at 500, 95 S.Ct. 2197. The "question ... is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* (footnote omitted). Neither the constitutional nor statutory provisions relevant in the instant case "properly" can be understood as granting Appellants a right to judicial relief.

## IV.

What Appellants seek is to "restore to the budget of the University of Hawai'i a sum of money which was deducted from it by [the governor and the finance director] in [alleged] violation of state law" or a declaration that such a deduction was illegal under HRS § 37–36. The Board, however, did not bring this suit and has not intervened in it. In arguing in their answering brief[3] that Appellants lack standing to sue, the governor and the finance director maintain that the Board, being constitutionally charged with formulating policy and exercising control over the University, is the body "if at all, who must protest the[ir] actions."[4] This contention is supported by the "exclusive jurisdiction" dec-

---

3. The governor and the finance director made the same argument below in their motion to dismiss complaint or in the alternative for summary judgment.

4. The governor and the finance director contend as follows:
   [I]t is the University of Hawai'i, through its Board of Regents, if at all, who must protest the actions of the Appellees. *See Board of Education v. Waihee,* 70 Haw. 253, 768 P.2d

laration in article X, § 6 and by the statutory framework governing budget allotments.

Within that framework, the legislature appropriates monies to departments like the University "to meet the requirements of the department." HRS § 37–31 (1993). No appropriation is available to a department unless it prepares an estimate of the amount of funds needed "to carry on the work of the department[.]" HRS § 37–34 (Supp.2000). Such estimates are to be approved, assuming certain conditions, by the director of finance. *See* HRS § 37–35 (Supp.2000). The resulting budgetary "allotment" may be modified or amended by the director of finance, HRS § 37–36, or reduced, following action by the governor, *see* HRS § 37–37, subject to certain contingencies.

Article X, § 6 and the foregoing statutes indicate that matters concerning the University's budget primarily fall within the internal management purview of the Board. The modification or reduction of the budget complained of by Appellants was not challenged in court by the Board. The determination not to do so was a matter preeminently within its constitutional and statutory power to formulate policy and to exercise control over the management of the University. Applying prudential principles, I must conclude the statutory provision on which Appellants' claim rests, properly cannot be understood as granting persons in Appellants' position standing to request judicial relief of the nature requested. In light of the constitution and the cited statutes, to allow Appellants to pursue their suit would undermine the University's independence and interfere in its internal management.

## V.

While we are faced in the instant case with a suit involving the University's budget, it is

---

1279 (1989). Under the Hawai'i State Constitution, Art. X, sec. 6, "[t]he [B]oard shall have the power ... to formulate policy, and to exercise control over the university through its executive officer, the president of the university...." The University is not the Plaintiff. In fact, the UH apparently acquiesced in the reduction. The Appellants are not the University of Hawai'i or its Board of Regents and have no authority to represent them.

difficult to conceive of a proper challenge involving other executive departments under similar circumstances. In my view, we should now confirm the doubt expressed in *Waihee* as to the standing of parties such as the Appellants: while a party may establish the right to sue in its own right, it has no standing to assert claims that might have been brought by an executive department, pursuant to HRS §§ 37–36 or 37–37, as against the governor and the finance director or either one of them.